```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF NEBRASKA
 2

 3    UNITED STATES OF AMERICA,     )    No. 8:20CR131
                                    )
 4             Plaintiff,           )
                                    )
 5    vs.                           )
                                    )
 6    JASON L. BATES,               )
                                    )    Omaha, Nebraska
 7             Defendant.           )    November 16, 2021

 8

 9                              VOLUME I
                    TRANSCRIPT OF TRIAL PROCEEDINGS
10           BEFORE THE HONORABLE BRIAN C. BUESCHER
             UNITED STATES DISTRICT JUDGE AND A JURY
11

12                        A-P-P-E-A-R-A-N-C-E-S

13    FOR THE PLAINTIFF:        Ms. Tessie L. Smith
                                Assistant United States Attorney
14                              100 Centennial Mall North
                                Suite 487, Federal Building
15                              Lincoln, NE 68508-3865

16                              Mr. Donald J. Kleine
                                Assistant United States Attorney
17                              1620 Dodge Street, Suite 1400
                                Omaha, NE 68102-1506
18
      FOR THE DEFENDANT:        Glenn A. Shapiro
19                              Schaefer Shapiro, LLP
                                1001 Farnam Street
20                              Third Floor
                                Omaha, NE 68102
21

22    COURT REPORTER:          Ms. Rogene S. Schroder, RDR, CRR
                               111 South 18th Plaza
23                             Suite 3129
                               Omaha, NE 68102
24                             (402) 661-7383

25    Proceedings reported by certified stenographer, transcript
      produced with computer.
```

2

```
 1           (At 8:47 a.m. on November 16, 2021; with counsel present;
 2    the defendant NOT present:)
 3                THE COURT:  You may be seated.
 4       We are on the record in United States of America versus
 5    Jason L. Bates, Case Number 8:20CR131.  Would counsel please
 6    enter your appearances.
 7                MS. SMITH:  Good morning, Your Honor.  Please enter
 8    the appearance of Tessie Smith and Don Kleine on behalf of the
 9    United States.
10                THE COURT:  For the defense.
11                MR. SHAPIRO:  For the defense, Glenn Shapiro.
12                THE COURT:  Thank you very much.  I will note for the
13    record that the defendant has not arrived yet.  There's
14    apparently some traffic trouble today.
15       Mr. Shapiro, did you have the occasion to run into that as
16    well?
17                MR. SHAPIRO:  I heard that, yes, Your Honor.
18                THE COURT:  Oh, you did?  Okay.
19                MR. SHAPIRO:  No, I did not run into it 'cause I came
20    from Gretna straight down I-80 so I was good.
21                THE COURT:  Oh, okay.  All right.  'Cause I was
22    wondering why we're starting at 8:45 instead of 8:30.
23                MR. SHAPIRO:  Actually, I got in the building at
24    about 8:33 'cause getting into the parking garage, there was an
25    extreme backup so my apologies.
```

1          THE COURT:  Okay.  All right.  Is there any reason

2     that we cannot go to trial today, Mr. Shapiro?

3          MR. SHAPIRO:  No reason I'm aware of, sir.

4          THE COURT:  Okay.  Ms. Smith.

5          MS. SMITH:  No, Your Honor.

6          THE COURT:  All right.  I'm just going to note some

7     preliminary matters given the defendant is not here.  If at any

8     point in time, Mr. Shapiro, you believe the defendant needs to

9     be here for some particular matter, let me know and we can

10    delay that matter until such time he is here; but -- but we're

11    just going to go over some procedural matters at this point in

12    time so...

13        Of course, the time for jury selection is going to be 20

14    minutes, opening will be 20 minutes, and closing will be 30

15    minutes.

16        I just want to talk about how long the parties anticipate

17    this trial going.  We'll start with Ms. Smith on that.

18         MS. SMITH:  Your Honor, I anticipate that the

19    government's case in chief will take throughout today and

20    likely into tomorrow.  Hopefully not into the afternoon but

21    possibly.

22         THE COURT:  Okay.  And, Mr. Shapiro, you're under

23    obviously no obligation to state whether or not you intend to

24    put on a case.  Do you anticipate any evidence at this point in

25    time just for planning purposes?

```
 1              MR. SHAPIRO:  Understood.  I do not, Your Honor.

 2              THE COURT:  Okay.  Given that, what I'll tell the

 3     jury is this'll be anticipated to be two to three days which

 4     would be today, tomorrow, and Thursday.  Does anyone have a

 5     problem with me suggesting that?  I know sometimes people have

 6     plans or other things that come up otherwise so I'll start with

 7     Mr. Shapiro.

 8              MR. SHAPIRO:  I have no concerns with that schedule.

 9              THE COURT:  Okay.  And from...

10              MS. SMITH:  No concerns, Your Honor.  Thank you.

11              THE COURT:  Okay.  Are there anything that -- are

12     there any stipulations ahead of trial?  We'll start with

13     Ms. Smith.

14              MS. SMITH:  Yes, Your Honor.  There's one stipulation

15     regarding some chain of custody issues as well as how a certain

16     video was received.  That stipulation has been signed and the

17     government intends to file that stipulation within the course

18     of the morning.

19              THE COURT:  Okay.  Given that, that will handle that

20     itself then.

21         Let's hear from Mr. Shapiro.  Is there anything from your

22     end?

23              MR. SHAPIRO:  No preliminary matters, Your Honor.

24              THE COURT:  Okay.  With regard to --  There's a

25     motion in limine from the government for an order -- that's
```

1    filing 46, for an order prohibiting statements or argument of

2    entrapment unless and until the record contains sufficient

3    evidence warranting an entrapment jury instruction or the

4    defendant otherwise makes a showing that such instruction will

5    be warranted.

6        I would hear a brief argument on that.  I've read your

7    brief and I'll hear from Mr. Shapiro as well.

8        So, Ms. Smith, do you wish to add anything?  And when you

9    argue, if you wouldn't mind standing, I'd appreciate it.

10            MS. SMITH:  Your Honor, I just intend to submit the

11   matter on the brief.

12            THE COURT:  Okay.  And then from Mr. Shapiro.

13            MR. SHAPIRO:  I would submit it as well, Your Honor.

14   We crossed this bridge a month ago --

15            THE COURT:  Okay.

16            MR. SHAPIRO:  -- in a similar trial so I'll submit.

17            THE COURT:  And you're not going to be surprised when

18   I give the same response that I gave a month ago which is, you

19   know -- you know, at this point actually the defense has not

20   requested an entrapment instruction, but the defense is free to

21   try to put on evidence or elicit testimony that would support

22   such an introduction if they wish to, you know, seek it later.

23        I think it's unlikely at this point that the defendant

24   would be able to demonstrate entrapment to the point that it

25   would warrant an instruction, but I'm not going to make such a

1  ruling ahead of seeing the evidence, and I'm not going to

2  prohibit the defense from making any particular arguments or

3  statements short of seeing the evidence at trial.

4      So the defendant and his attorney are free to put on their

5  case with the knowledge that the entrapment instruction is

6  likely -- is unlikely to be given so it's not likely to be

7  given.  So I will deny the motion in limine at this time with

8  the ability for the United States to remake the motion if they

9  so see the need.

10     So at this point in time, I just want to talk about the

11 format of the trial.  We'll start at 9 a.m. each day.  We're

12 going to break around noon for the day and -- for the day

13 around 4:30.  We will take a morning and afternoon break for

14 Rogene.

15     Questioning will be from the -- the podium for voir dire

16 and the desk podium for the questioning of the witnesses.  So

17 up here is where I'm going to have you do your voir dire so you

18 can see the entire panel.  Part of the panel will be in the

19 gallery back there, part of the panel will be in the box.

20 However, when you question witnesses, I would like you to use

21 the podiums that are directly behind you.

22     I want to ask the government a question.  In a trial a

23 while back, the witnesses on a similar case -- I think they're

24 the same people.  We had to delay the trial because the witness

25 was not vaccinated and had a close contact.  At a previous

1    trial on this, I ordered all the witnesses to wear masks at all

2    times because of that.  I'm inclined to do that again given I

3    knew that these folks weren't vaccinated -- and -- and -- and I

4    think several of them were not -- causing the delay of the

5    trial.

6        I just want to give you an opportunity to have any

7    argument about that and I'll give the defense the same

8    opportunity.

9            MS. SMITH:  Your Honor, at this time I'm not aware

10   whether or not any of the government's witnesses are vaccinated

11   or unvaccinated.  For clarification would -- would that order

12   pertain to all witnesses or just the witnesses who we know are

13   unvaccinated?

14           THE COURT:  Well, I would be fine doing it for those

15   that we just know were unvaccinated, but on the other hand, I

16   don't -- you know, I think there's some optics here --

17           MS. SMITH:  Sure.

18           THE COURT:  -- where you -- you know, it's a

19   little -- it's a little easier to -- to have them all wear

20   them, but on the other hand, I would be fine with that; but I

21   want to give -- hear the defense -- the opportunity to -- to

22   have -- to say what they wish to say about that as well.

23       So at this point I'll hear from Mr. Shapiro on that

24   question just because I -- these same witnesses, at least two

25   of them, I believe, I think more than that actually, we had to

```
 1    delay a trial -- was it your trial?

 2                MR. SHAPIRO:  It was, Your Honor.

 3                THE COURT:  Okay.  And you consented to the -- the --

 4    the mask last time.  I'm inclined to do that again.  I want to

 5    hear what you have to say about that.

 6                MR. SHAPIRO:  Judge, I have no preference.  Whatever

 7    the Court or the government works out is fine with the defense.

 8                THE COURT:  Okay.  Here's what I would like.  I would

 9    like to know -- if there are people who are not vaccinated,

10    make them wear a mask.  If you can't tell who's not vaccinated,

11    make them all wear masks, okay?  So that's what I would like to

12    do.

13         Just so you all know, I'm going to have the same mask

14    policy I had with Mr. Shapiro previously.  You counsel

15    cannot -- you don't have to wear masks because you're talking

16    to each other at all times and that's fine.  During voir dire,

17    I'm going to have everyone in the gallery and all the -- the --

18    the jurors, the entire courtroom wearing a mask except for you

19    all 'cause you have speaking roles.

20         During the trial, the jurors will be able to not wear a

21    mask if they are vaccinated based on the honor system.  My

22    staff is not going to wear masks because we're all vaccinated.

23         That's the way I'm going to handle things, you know, and

24    so that's -- that's just for you all to know so it's the same

25    as I've handled previously.
```

1    One thing I'll note for the record again, I don't allow

2    any speaking objections.  I do just request when you make your

3    objection, state the objection and the reason for it so, you

4    know, objection, form or whatever you're going to say.  You

5    know, a few words is fine.  If you got -- if you need -- we

6    will take sidebars if we need to.  Hopefully, we can keep them

7    to a minimum.  I don't anticipate we having any issues with

8    that given how Mr. Shapiro's last trial went so I think we

9    should be okay, but that's just for the record.

10   The jury selection question, I already told you how you're

11   going to -- you're going to be up here at the podium.  The jury

12   will be composed of 12 jurors with 2 additional jurors serving

13   as alternates.  The 12 lowest juror numbers remaining after

14   strikes for cause and peremptory strikes will be the 12-person

15   jury.

16   The 12-person jury will be selected first with the

17   defendant receiving 10 peremptory strikes and the United States

18   receiving 6 peremptory strikes.  As to the alternate jurors,

19   following the selection of the 12-person jury, each party will

20   have one additional peremptory strike during the selection of

21   the two alternate jurors.  This is in accordance with Federal

22   Rule of Criminal Procedure 24(c)(4).  So all potential jurors

23   will be allowed to answer questions during voir dire and are

24   eligible for exclusion by peremptory challenges.

25   Are there any questions or objections to the selection

1    process?  I'll start with Ms. Smith.

2              MS. SMITH:  No, Your Honor.

3              THE COURT:  Mr. Shapiro.

4              MR. SHAPIRO:  No objection to that process.

5              THE COURT:  Okay.  As to exhibits, just please ask

6    permission before publishing.  And with regard to Instruction

7    No. 1, I had the instructions emailed to everyone late last

8    week, I believe.  Is there any --  I do have to read

9    Instruction No. 1 at the beginning I guess early on in the

10   proceedings.  So are there any objections to Instruction No. 1?

11   Ms. Smith.

12             MS. SMITH:  Not from the government.

13             THE COURT:  Okay.  And Mr. Shapiro.

14             MR. SHAPIRO:  There's no objection to 1, Your Honor.

15             THE COURT:  Okay.  I've -- I received the juror --

16   the proposed jury instruction request from the government and I

17   have not received any from the defense.  If there are any

18   additional instructions requested, I request that they be

19   provided by the beginning of the last day of trial, so we could

20   easily be tomorrow morning so -- that's possible, so if

21   something comes up, I understand that -- if something comes up

22   that requests the jury instruction, let me know otherwise what

23   we will do in this case, we will have a jury instruction

24   conference that you'll be able to make your arguments on the

25   record as to all the instructions.

 1          I'll just -- we'll get this thing going and -- get the

 2     proceedings going and then I'll let you know when we'll have

 3     it.  It'll probably be at a noon hour or I'll tell you -- maybe

 4     tomorrow morning early, we'll come in a little early and get

 5     that conference done.

 6          I do request that the parties stay within 10 minutes of

 7     the courthouse to respond to questions, if any, and be back for

 8     a verdict once the verdict is given or once the -- the case is

 9     given to the jury for deliberations.

10          So -- okay.  Those are the matters that I had that -- on

11     my list of things to consider.

12          Ms. Smith, is there anything else we should consider

13     before we proceed to picking a jury in this case, assuming the

14     U.S. Marshals can bring us a defendant?

15               MS. SMITH:  Your Honor, if I may just briefly.

16     Because this is my first time appearing in front of you, one

17     question for clarification.  After I am done presenting

18     questions to a witness and it is Mr. Shapiro's turn, do I

19     return to this seat or do I remain at the podium?

20               THE COURT:  I would like you to return to that seat

21     right there so I can see you.

22               MS. SMITH:  Perfect.  Thank you.

23               THE COURT:  Okay.  So, yeah, I just like -- given

24     particularly the COVID situation, the podiums work a lot better

25     'cause everyone's got their own space and so, yeah, you --

1          (Defendant's appearance is noted.)

2          THE COURT:  -- just return there and then -- and then

3     you'll return there for any redirect so --

4          MS. SMITH:  Thank you.

5          THE COURT:  -- so, okay.

6     I see we --  I'll just note for the record the defendant

7     has now entered the room.

8     Given the defendant is now here and I'll now give you,

9     Mr. Shapiro, any opportunity that you -- if you have any other

10    questions or anything you'd like to bring up at this point in

11    time.

12         MR. SHAPIRO:  Thank you.  I have no issues to address

13    at this time, Your Honor.

14         THE COURT:  Okay.  Given that, our preliminary

15    discussion as a matter -- for the courtesy of the defendant

16    here, we just had some procedural matters we just discussed.

17    That's what we were doing just now.  So we have now discussed

18    those with counsel.

19    And at this point in time, we will take a recess until

20    such time we can get jury selection going.

21    How long do you think...

22         COURTROOM DEPUTY:  They will be ready -- we have 38.

23    We have 38 ready to go.

24         THE COURT:  Okay.  So we'll -- they'll be brought in

25    here in what?  Fifteen minutes shall we start?

```
1              COURTROOM DEPUTY:  Yes.

2              THE COURT:  Okay.  It's 9 o'clock a.m.  We will start

3       at 9:15 a.m.  So thank you very much.

4              We are in recess until 9:15 a.m.

5              (Recess taken at 9 a.m.)

6              (Jury empaneled and sworn.)

7              THE COURT:  You may be seated.  And let the record

8       reflect that a jury has been selected in this case.

9              At this point in time, we are going to take a lunch break

10      and we're going to come back here at 12:35 p.m. to start the

11      trial.  I want to keep this thing going to respect all of your

12      time.  Before you leave, I want to remind you of the following

13      admonitions which you should keep in mind throughout this

14      trial.

15             You must not discuss this case with anyone, including the

16      other jurors, members of your family, people involved in the

17      trial, or anyone else.  Do not allow anyone to discuss this

18      case with you or within your hearing.  Only you have been

19      chosen as jurors in this case and only you have sworn to uphold

20      the law.  No one else has been chosen to do this.

21             You should not even talk among yourselves about the case

22      before you have heard all the evidence and the case has been

23      submitted to you by me for deliberations because it may affect

24      your final decision.

25             If anyone tries to talk to you about the case, please let
```

1    me know about it immediately.  When I say you must not discuss

2    the case with anyone, I also mean do not email, send text

3    messages, blog, or engage in any other form of written, oral,

4    or electronic communication.

5         With that, members of the jury, you are now excused for

6    lunch and must be back by 12:35 p.m.  Please -- please follow

7    my courtroom deputy out.

8         (Jury out at 11:36 a.m.)

9              THE COURT:  You may be seated.

10        We are now outside the presence of the jury.

11        Counsel, I intend to proceed with opening statements after

12   lunch.  Is there anything that needs to be addressed outside

13   the presence of the jury prior to opening statements?  Start

14   with Ms. Smith.

15             MS. SMITH:  Not for the government, Your Honor.

16   Thank you.

17             THE COURT:  Okay.  Mr. Shapiro.

18             MR. SHAPIRO:  No, Your Honor.

19             THE COURT:  Okay.  We will return at 12:35 p.m.

20   Thank you very much.

21        (Recess taken at 11:37 a.m.)

22        (At 12:42 p.m. on November 16, 2021; with counsel and the

23   defendant present; WITHOUT the jury:)

24             THE COURT:  Counsel, is there anything we need to

25   handle before bringing in the jury for me to read Instruction

1  No. 1 and then start with opening statements?  We'll start with

2  Ms. Smith.

3      MS. SMITH:  Just briefly, Your Honor.  Based on what

4  you indicated this morning, the government has learned there is

5  a single witness who is not vaccinated and he has been informed

6  that he needs to wear his mask.

7      THE COURT:  Okay.  And would you tell me who that is

8  so that I don't ask him to take his mask off.

9      MS. SMITH:  Yes.  That is Deputy Chad Miller.

10      THE COURT:  Okay.  Okay.  I will --  My intention is

11  then -- as to Mr. Miller, I'll just let him remain with his

12  mask on.  It may look a little funny that he didn't get asked

13  to remove his mask and everyone else did.

14    Do you have any comment on that?  I intend just to proceed

15  that way.

16      MS. SMITH:  That's fine, Your Honor.

17      THE COURT:  Okay.  Any comment from the defense about

18  that or anything else?

19      MR. SHAPIRO:  No, Your Honor, across the board.

20      THE COURT:  Okay.  Thank you.  We will now bring in

21  the jury.

22    Thank you.

23    (Jury present at 12:43 p.m.)

24      THE COURT:  You all may be seated.

25    We are, of course, back on the record in United States of

1    America versus Jason L. Bates, Case Number 8:20CR131.  First of

2    all, I'll just remind the jury that my policy is that if you

3    are fully vaccinated, you may remove your mask if you want to

4    while you're here at the trial.  As you can see, we're all

5    spaced out now.  We have space between us.  But you don't have

6    to.  You can wear your mask the entire trial if you wish.  That

7    is totally up to you.

8        As to those in the gallery, I'm going to ask anyone in the

9    gallery to put on a mask at all times so that's my request for

10   the gallery.  And as I said before, the parties who have a

11   speaking role in this matter and who are doing the work here

12   may have their mask removed.  So thank you very much.

13       Ladies and gentlemen, I will now take a few moments to

14   give you some instructions about this case and about your

15   duties as jurors.  At the end of the trial, I'll give you more

16   instructions.  I may also give you instructions during the

17   trial.  All instructions, those I give you now and those I give

18   you later, whether they are in writing or given to you orally,

19   are equally important and you must follow them all.

20       This is a criminal case brought against the defendant by

21   the United States Government.  The defendant is charged with

22   attempting to persuade, induce, or entice a minor to engage in

23   sexual activity.  That charge is set forth in what is called an

24   Indictment which I will ask the government attorney to read for

25   you now.

1           MR. KLEINE:  Thank you, Your Honor.

2       Your Honor, in the matter of the United States District

3    Court for the District of Nebraska, in the matter of United

4    States of America versus Jason L. Bates, the grand jury charges

5    at Count I:  Beginning on or about March 30th, 2020, through on

6    or about April 6th, 2020, in the District of Nebraska and

7    elsewhere, the defendant, Jason L. Bates, did use any facility

8    of interstate and foreign commerce to knowingly attempt to

9    persuade, induce, and entice an individual who had not attained

10   the age of 18 years to engage in prostitution and sexual

11   activity for which the defendant could be charged with a

12   criminal offense, in violation of Title 18, United States Code,

13   Section 2422(b).

14           THE COURT:  Ladies and gentlemen, you should

15   understand that an indictment is simply an accusation.  It is

16   not evidence of anything.  The defendant has pleaded not guilty

17   and is presumed to be innocent unless and until proved guilty

18   beyond a reasonable doubt.

19       It will be your duty to decide from the evidence whether

20   the defendant is guilty or not guilty of the crime charged.

21   From the evidence, you will decide what the facts are.  You're

22   entitled to consider the evidence in the light of your own

23   observations and experiences in life.  You may use reason and

24   common sense to draw deductions or conclusions from facts which

25   I have been -- which have been established by the evidence.

1    You will then apply those facts to the law which I give you in

2    these and my other -- and in my other instructions and in that

3    way reach your verdict.  You are the sole judges of the facts,

4    but you must follow my instructions whether you agree with them

5    or not.  You have taken an oath to do so.

6         Do not allow sympathy or prejudice to influence you.  The

7    law demands of you a just verdict, unaffected by anything

8    except the evidence, your common sense, and the law as I give

9    it to you.

10        You should not take anything I may say or do during the

11   trial as indicating what I think of the evidence or what I

12   think your verdict should be.

13        Finally, please remember that only this defendant, not

14   anyone else, is on trial here, and that this defendant is on

15   trial only for the crime charged, not for anything else.

16        I have mentioned the word "evidence."  "Evidence" includes

17   the testimony of witnesses, documents, and other things

18   received as exhibits, any facts that have been stipulated, that

19   is, formally agreed to by the parties, and any facts that have

20   been judicially noticed, that is, facts that I say you may but

21   are not required to accept as true even without evidence.

22        Certain things are not evidence.  I will list those things

23   for you now:

24        Statements, arguments, questions, and comments by lawyers

25   representing parties in this case are not evidence.

1    Objections are not evidence.  Lawyers have a right to

2    object when they believe something is improper.  You should not

3    be influenced by the objection.  If I sustain an objection to a

4    question, you must ignore the question and must not try to

5    guess what the answer might have been.

6    Testimony that I strike from the record or tell you to

7    disregard is not evidence and must not be considered.

8    Anything you see or hear about this case outside the

9    courtroom is not evidence unless I specifically tell you

10   otherwise during the trial.

11   Furthermore, a particular item of evidence is sometimes

12   received for a limited purpose only.  That is, it can be used

13   by you only for one particular purpose and not for any other

14   purpose.  I will tell you when that occurs and instruct you on

15   the purposes for which the item can and cannot be used.

16   Finally, some of you may have heard the terms "direct

17   evidence" and "circumstantial evidence."  You are instructed

18   that you should not be concerned with those items -- or those

19   terms.  The law makes no distinction between direct and

20   circumstantial evidence.  You should give all evidence the

21   weight and value you believe it is entitled to receive.

22   In deciding what the facts are, you may have to decide

23   what testimony you believe and what testimony you do not

24   believe.  You may believe all of what a witness said, or only

25   part of it, or none of it.

1    In deciding what testimony of any witness to believe,

2  consider the witness's intelligence, the opportunity the

3  witness had to have seen or heard the things testified about,

4  the witness's memory, any motives that witness may have for

5  testifying a certain way, the manner of the witness while

6  testifying, whether that witness said something different at an

7  earlier time, the general reasonableness of the testimony, and

8  the extent to which the testimony is consistent with other

9  evidence that you believe.

10    At the end of the trial, you must make your decision based

11  on what you recall of the evidence.  You will not have a

12  written transcript to consult.  You must pay close attention to

13  the testimony as it is given.

14    If you wish, however, you may take notes to help you

15  remember what witnesses said.  My courtroom deputy will provide

16  you each with a pad of paper and a pen or a pencil.

17    If you do take notes, please keep them to yourself until

18  you and your fellow jurors go to the jury room to decide the

19  case and do not let note-taking distract you so that you do not

20  hear other answers by the witness.  Remember, it is your own

21  individual responsibility to listen carefully to the evidence.

22    At each recess, leave your notes in the jury room.  When

23  you leave at night, they will be secured and will not be read

24  by anyone.

25    I do not allow jurors to ask or present written questions

1    to any witnesses.  In other words, I do not allow jurors to

2    question witnesses either directly or indirectly.

3         During the trial, it may be necessary for me to talk with

4    the lawyers out of the hearing of the jury, either by having a

5    bench conference here while the jury is present in the

6    courtroom, or by calling a recess.  Please understand that

7    while you are waiting, we are working.  The purpose of these

8    conferences is to decide how certain evidence is to be treated

9    under the rules of evidence and to avoid confusion and error.

10   We will, of course, do what we can to keep the number and

11   length of these conferences to a minimum.

12        To ensure fairness, you as jurors must obey the following

13   rules:

14        First, do not talk or communicate among yourselves about

15   this case or about anyone involved with it until the end of the

16   case when you go to the jury room to decide your verdict.

17        Second, do not talk with anyone else about this case or

18   about anyone involved with it until the trial has ended and you

19   have been discharged as jurors.  You must leave your cell

20   phones, smartphone, iPhone, tablet, computer, or any other

21   wireless communication device in the jury room during the trial

22   and may only use them during breaks.  You will have to turn

23   those devices "off" in the jury room during your deliberations.

24        Third, when you are outside the courtroom, do not let

25   anyone tell you anything about the case or about anyone

1    involved with it until the trial has ended and I have accepted

2    your verdict and discharged you as jurors.  If someone should

3    try to talk to you about the case during the trial, please

4    report it to my courtroom deputy.

5        Fourth, during the trial, you should not talk with or

6    speak to any of the parties, lawyers, or witnesses involved in

7    this case.  You should not even pass the time of day with any

8    of them.  It is important not only that you do justice in this

9    case but that you also give the appearance of doing justice.

10   If a person from one side of the lawsuit sees you talking to a

11   person from another side, even if it is simply to pass the time

12   of day, an unwarranted and unnecessary suspicion about your

13   fairness might be aroused.  If any lawyer, party, or witness

14   does not speak to you when you pass in the hall, ride the

15   elevator or the like, it is because they are not supposed to

16   talk to you or visit with you.

17       Fifth, it may be necessary for you to tell your family,

18   close friends, teachers, coworkers, or employer about your

19   participation in this trial.  You can explain when you are

20   required to be in court and can warn them not to ask you about

21   this case, tell you anything they know or think they know about

22   this case, or discuss this case in your presence.  You must not

23   communicate with anyone or post information about the parties,

24   witnesses, participants, charges, evidence, or anything else

25   related to this case.  You must not tell anyone anything about

1    the jury's deliberations in this case until after I accept your

2    verdict or until I give you specific permission to do so.

3        If you discuss the case with someone other than the other

4    jurors during deliberations, it could create the perception

5    that you have clearly decided the case or that you may be

6    influenced in your verdict by their opinions.  That would not

7    be fair to the parties and it may result in the verdict being

8    thrown out and the case having to be retried.

9        During the trial while you are in the courthouse and after

10   you leave for the day, do not provide information to anyone by

11   any means about this case.  For example, do not talk

12   face-to-face or use any electronic device or media, such as the

13   telephone, cell phone, or smartphone, computer, the Internet,

14   any Internet service, any text or instant messaging service,

15   any Internet chat room, blog, or website such as Facebook,

16   Snapchat, Instagram, YouTube or Twitter, or any other way to

17   communicate to anyone any information about this case until I

18   accept your verdict.

19       Sixth, do not do any research on the Internet, in

20   libraries, in the newspapers, or in any other way or make any

21   investigation about this case on your own.  Do not visit or

22   view any place discussed in this case and do not use the

23   Internet, Google Maps, or any other program or device to search

24   for or to view any place discussed in the testimony.  Also, do

25   not research any information about this case, the law, or the

1   people involved, including the parties, the witnesses, the

2   lawyers, or the judge.

3         Seventh, do not read any news stories or articles in

4   print, or on the Internet, or in any blog about the case or

5   about anyone involved with it, or listen to any radio or

6   television reports about the case or about anyone involved with

7   it.  In fact, until the trial is over, I suggest that you avoid

8   reading any newspapers or news journals at all and avoid

9   listening to any television or radio newscasts at all.  I do

10  not know whether there might be any news reports of this case,

11  but if there are, you might inadvertently find yourself reading

12  or listening to something before you could do anything about

13  it.  If you want, you can have your spouse or a friend clip out

14  any stories and set them aside to give you after the trial is

15  over.  I can assure you, however, that by the time you have

16  heard the evidence in this case, you will know what you need to

17  return a just verdict.

18        The parties have a right to have the case decided only on

19  evidence they know about and that has been introduced here in

20  court.  If you do some research or investigation or experiment

21  that we do not know about, then your verdict may be influenced

22  by inaccurate, incomplete, or misleading information that has

23  not been tested by the trial process, including the oath to

24  tell the truth and by cross-examination.

25        All of the parties are entitled to a fair trial rendered

1   by an impartial jury, and you must conduct yourselves so as to

2   maintain the integrity of the trial process.  If you decide a

3   case based on information not presented in court, you will have

4   denied the parties a fair trial in accordance with the rules of

5   this country and you will have done an injustice.  It is very

6   important that you abide by these rules.  Remember, you have

7   taken an oath to abide by these rules and you must do so.

8        Eighth, do not make up your mind during the trial about

9   what the verdict should be.  Keep an open mind until after you

10   have gone to the jury room to decide the case and you and your

11   fellow jurors have discussed the evidence.

12        The trial will proceed in the following manner:

13        First, the government will make an opening statement.

14   Next, the defendant's attorney may, but does not have to, make

15   an opening statement.  An opening statement is not evidence but

16   is simply a summary of what the attorney expects the evidence

17   to be.

18        The government will then present its evidence and counsel

19   for the defendant may cross-examine.  Following the

20   government's case, the defendant may, but does not have to,

21   present evidence, testify, or call other witnesses.  If the

22   defendant calls witnesses, the government may cross-examine

23   them.

24        After presentation of the evidence is completed, the

25   attorneys will make their closing arguments to summarize and

1    interpret the evidence for you.  As with opening statements,

2    closing arguments are not evidence.  The Court will instruct

3    you further on the law.  After that, you will retire to

4    deliberate on your verdict.

5        Members of the jury, now the parties will proceed with

6    their opening statements.  I remind you that these statements

7    are not evidence but simply what the parties expect the

8    evidence to show.  Each side will have 20 minutes.  The

9    attorney for the government will begin.

10       Ms. Smith, you may proceed.

11            MS. SMITH:  Thank you.

12            THE COURT:  I will remind those sitting in the

13   gallery, all members of the gallery must have their masks on at

14   all times with no exceptions.

15       Thank you.

16       (Opening statements were given.)

17            THE COURT:  Ladies and gentlemen, the government is

18   going to begin presenting evidence in the time that we have

19   remaining today.  With that, you may call your first witness,

20   Ms. Smith.

21            MS. SMITH:  Thank you, Your Honor.  The government

22   calls Douglas County Sheriff's Office Deputy Charles Miller,

23   Jr.

24            THE COURT:  Mr. Miller, you may come up here, stand

25   next to the witness chair, and at that point in time, the

Miller - Direct (Smith)                                          27

1    courtroom deputy will swear you in.

2                THE WITNESS:  Okay.

3                COURTROOM DEPUTY:  Please state your full name for

4    the record and spell your full name.

5                THE WITNESS:  Chad Miller, C-h-a-d M-i-l-l-e-r.

6                 CHAD MILLER, PLAINTIFF'S WITNESS, SWORN

7                THE COURT:  You may be seated.

8                THE WITNESS:  Thank you.

9                THE COURT:  Please proceed, Ms. Smith.

10               MS. SMITH:  Thank you, Your Honor.

11                          DIRECT EXAMINATION

12   BY MS. SMITH:

13   Q.   Good afternoon, Deputy Miller.

14   A.   Afternoon.

15   Q.   Can you tell the jury how you're currently employed?

16   A.   Yes.  I'm a deputy with the Douglas County Sheriff's

17   Office.

18   Q.   And how long have you been in law enforcement in general?

19   A.   Fifteen years.

20   Q.   Okay.  And how long with the Deputy -- or, excuse me,

21   Douglas County Sheriff's Office?

22   A.   About 15 years.

23   Q.   What was your assignment previous that?

24   A.   Well, my current assignment or what did I do prior to

25   being a deputy or...

1   Q.   Yes.

2   A.   Prior to being a deputy, I worked at Boys Town for

3   approximately seven years as a family teacher.

4   Q.   Are you also part of an FBI task force?

5   A.   Yes.

6   Q.   Can you tell the jury a little bit about that?

7   A.   Yes.  So in the Douglas County Sheriff's Office, I'm

8   assigned to our criminal investigations division, and my

9   full-time assignment is the FBI Child Exploitation and Human

10  Trafficking Task Force.

11  Q.   And what are some of your duties as part of that task

12  force?

13  A.   To investigate crimes involving child exploitation, sex

14  trafficking, child abuse, like sexual abuse, images and videos

15  of children.

16  Q.   Have you received any specialized training related to

17  investigations of prostitution or sex trafficking crimes?

18  A.   Yes.

19  Q.   Can you discuss a little bit of that training.

20  A.   Sure.  So our basic investigative training would start at

21  the academy, and specific to sex trafficking and child

22  exploitation, I've had training through the FBI's violent

23  crimes unit, training with their online covert employee program

24  which is working online undercover.  I've had training through

25  Project Harmony, through Boys Town, as well as Homeland

Miller - Direct (Smith)                                    29

1   Security and St. Thomas School of Law.

2   Q.   So during all of your time as part of this task force and

3   as a deputy with the Douglas County Sheriff's Office, have you

4   personally had contact with persons involved in sex

5   trafficking?

6   A.   Yes.

7   Q.   Can you explain for the jury, what is sex trafficking?

8   A.   Sex trafficking is when somebody is recruited or enticed

9   or solicited into -- to engage in a commercial sex act.

10  Q.   And are those people always adults?

11  A.   They're not always adults.  Often they're minors.

12  Q.   And are those people always doing it of their own

13  volition?

14  A.   No.

15  Q.   Can you talk about that a little bit.

16  A.   Yes.  With sex trafficking where an adult is being

17  victimized, then we're going to look for elements of force,

18  fraud, or coercion.  In sex trafficking a minor, so if we have

19  somebody under 18 that is being trafficked, they cannot consent

20  to work in prostitution; and so you wouldn't need those

21  elements of force, fraud, or coercion.  Just the mere fact that

22  they're engaging in a commercial sex act in exchange for

23  something of value would be sex trafficking of a minor.

24  Q.   Okay.  Are there any particular concerns when it comes to

25  a minor being sex-trafficked?

Miller - Direct (Smith)                                    30

1   A.    Yes.

2   Q.    Can you describe those?

3   A.    Well, a minor often is vulnerable to trafficking just by

4   the mere fact that they're a child and it's very -- it's risky,

5   I guess.  Many times children that are trafficked are people

6   that have been victimized in other ways in their life or

7   reported missing.

8   Q.    Have you been involved in any undercover investigations

9   targeting the sex trafficking of minors in Omaha, Nebraska?

10  A.    Yes.

11  Q.    Why do you engage in undercover investigations rather

12  than, say, patrolling the streets or responding complaints or

13  trying to find -- or minors in that way?

14  A.    There's multiple ways that we do try to address sex

15  trafficking of minors.  One of the reasons we do undercover

16  investigations is because really the world of commercial sex

17  and prostitution and areas where minors are trafficked, it's

18  just kind of a -- really like a dark underground world, kind of

19  its own world; and in order for us to identify minors that are

20  being trafficked or identify traffickers or people in our

21  community that would purchase a minor for sex, we need to

22  operate in that same underground capacity; and so we use

23  undercover investigations to do that.

24  Q.    So just to clarify, this isn't the only way that you

25  investigate this sort of crime.

Miller - Direct (Smith)                                        31

1    A.   Correct.

2    Q.   There are also efforts being taken to actively seek out

3    and find actual minors who are being trafficked.

4    A.   Correct.

5    Q.   Okay.  In your undercover operations, why is an undercover

6    officer used instead of a real child?

7    A.   We wouldn't want to place a child in a situation that

8    could be dangerous for them or even a matter of engaging in

9    text conversations with somebody that wants to purchase sex.

10   We would not want to subject a child to the sexual

11   conversation.

12   Q.   And I don't -- I'm not certain if we've covered this

13   earlier.  Have you had specific training on how to work as an

14   undercover officer?

15   A.   Yes.

16   Q.   Now, were you employed with the Douglas County Sheriff's

17   Office and part of the FBI task force in March of 2020?

18   A.   Yes.

19   Q.   Were you involved in a prostitution investigation between

20   approximately March 30th and April 6th of 2020?

21   A.   Yes.

22   Q.   Can you describe how that investigation began.

23   A.   Yes.  It began by posting an ad for prostitution on a site

24   that's commonly used for the sale of sex and pretty heavily

25   used in the Omaha area called skipthegames.com.

1    Q.    Okay.  So Skip the Games is a website known for

2    prostitution.  Does it have any other purposes?

3    A.    No.

4    Q.    Okay.  Have you used the website Skip the Games in these

5    types of investigations previously?

6    A.    Yes.

7              MS. SMITH:  Your Honor, may I approach the witness?

8              THE COURT:  You may.

9    BY MS. SMITH:

10   Q.    Deputy Miller, I've handed you what's been marked as

11   Government Exhibit 1.  Do you recognize this exhibit?

12   A.    Yes.

13   Q.    What is it?

14   A.    This would be like a screenshot of the home page of Skip

15   the Games.

16   Q.    Does this exhibit fairly and accurately reflect the home

17   page of the Skip the Games website where you posted this ad in

18   March of 2020?

19   A.    Yes.

20             MS. SMITH:  Your Honor, at this time I would move to

21   admit Government Exhibit 1.

22             MR. SHAPIRO:  No objection to 1, Your Honor.

23             THE COURT:  Exhibit 1 is admitted.

24             MS. SMITH:  May I approach?

25             THE COURT:  You may.

1       MS. SMITH:  Your Honor, may I have permission to

2  publish Government Exhibit 1?

3       THE COURT:  You may.

4  BY MS. SMITH:

5  Q.   So again, Deputy Miller, this is the home page of the Skip

6  the Games website?

7  A.   Correct.

8  Q.   And it appears that at the top of the page, there are a

9  few different cities listed.  Is that where a person seeking

10  services of a prostitute would click to find their individual

11  city?

12  A.   Yes.  In that area or in that area right above it as well.

13  Q.   Okay.  And it appears that there's a ring box but instead

14  of a ring, there's a condom inside it.

15  A.   Correct.

16  Q.   I want to turn your attention to the ad you created in

17  March of 2020.

18       MS. SMITH:  Your Honor, may I approach the witness

19  and have continuing permission to do so?

20       THE COURT:  You may.

21       MS. SMITH:  Thank you.

22  BY MS. SMITH:

23  Q.   Deputy Miller, I've handed you what's been marked as

24  Government Exhibit 2.  Do you recognize this document?

25  A.   Yes.

Miller - Direct (Smith)                                          34

1   Q.    What is it?

2   A.    This is a screenshot of the undercover ad that I posted.

3   Q.    Okay.  Is this a fair and accurate copy of the

4   advertisement you created in March of 2020?

5   A.    Yes.

6           MS. SMITH:  Your Honor, I would move to admit this

7   exhibit at this time and also move to publish.

8           THE COURT:  Okay.

9           MR. SHAPIRO:  No objection to 2, Your Honor.

10          THE COURT:  Exhibit 2 is admitted.

11          MS. SMITH:  And now I move to publish.

12          THE COURT:  Okay.  Please do so.

13      (Exhibit 2 was displayed.)

14          MS. SMITH:  Kathy, can you focus in on the title of

15   the page.

16   BY MS. SMITH:

17   Q.    Deputy Miller, how was this advertisement titled?

18   A.    KITTY Loves to PURRRR.

19   Q.    Okay.  And are there photographs of the purported minor on

20   this page?

21   A.    Yes.

22   Q.    Can you describe those photographs.

23   A.    Yes.  There's two photographs of her face.  One there on

24   the upper left with the glasses and then the teddy bear ears,

25   and then one in front of the lockers with glasses and teddy

1    bear ears, and that is a female Douglas County sheriff's

2    deputy.

3    Q.   Okay.  And it appears that the animal filter is somewhat

4    obscuring her face.  Is that --

5    A.   Correct.

6    Q.   Okay.  Is there an age listed on this page?

7    A.   Yes.

8            MS. SMITH:  Hang on one second.

9    BY MS. SMITH:

10   Q.   And what does it state the age is?

11   A.   Nineteen years old.

12   Q.   Now, you've stated you've used this web page or, excuse

13   me, this website in your previous investigations.  Is there a

14   minimum age that can be listed on this website?

15   A.   Yes, 19.

16   Q.   And what happens if someone creates an advertisement and

17   puts an age less than 19?

18   A.   It won't post the ad or it'll take the ad down.

19   Q.   Okay.  And what about if a person posts an ad and it says

20   they're 19 at the top of the page but then somewhere in the

21   body of the advertisement they indicate they're younger

22   than 19?

23   A.   Then it would take the ad down.

24   Q.   Now, turning towards the middle of this exhibit, are there

25   words that describe the person being advertised?

Miller - Direct (Smith)                                                36

1    A.    Yes.

2    Q.    What are some of those words?

3    A.    And are you focusing --  Well, so if you start at the top

4    I guess where it kind of does the biological description, it

5    says that it's a Caucasian female that sees men, that she is --

6    her breasts are small and petite and natural, that her grooming

7    down under is shaved, it lists a height and weight there of 5-1

8    to 5-3 and 119 pounds, no piercings, no tattoos.

9    Q.    Now, based on your training and experience, are there

10   words that tend to be used in these advertisements when the

11   person being advertised is actually a minor?

12   A.    Yes.

13   Q.    And what are some of those words?

14   A.    They could be words that would just indicate a younger

15   body or a younger person.  So it could be things like perky, it

16   could be things like petite or firm.  Sometimes you might see

17   daddy's girl or schoolgirl.

18   Q.    Can you point out some of those names [*sic*] being used on

19   this advertisement.

20   A.    Well, in the first line, it says, "I'm a perky girl..."

21   The second line, it says, Tight -- "so tasty and tight."

22   Q.    And then in addition, as you previously described, when it

23   talks about her breast size, did it say small?

24   A.    It did.

25   Q.    And it also had a weight of 119 pounds?

Miller - Direct (Smith)                                          37

1    A.    Correct.

2    Q.    Okay.  Now, there appear to be some -- some abbreviations

3    on this page.  Are there common code words used in sex

4    trafficking or prostitution?

5    A.    Yes.

6    Q.    Okay.  Why are code words used?

7    A.    Code words are typically used to try to circumvent law

8    enforcement and then they gradually just kind of become part of

9    the culture.

10   Q.    Okay.  And so if code words are being used, is it

11   something that's commonly known by the women who are being sold

12   for sex?

13   A.    Yes.

14   Q.    And would those code words also be known by individuals

15   who frequently purchase sex?

16   A.    Yes.

17   Q.    Now, on this page, for example, there appears to be a few

18   code words or abbreviations.  Can you tell the jury what qv

19   means?

20   A.    Qv would be like a quick visit, and that's referring to

21   the amount of time that's being purchased which would typically

22   be less than 30 minutes, 15 to 20 minutes, and commonly would

23   include like a quick sex act.

24   Q.    And so on this advertisement, it says 80qv.  What does the

25   80 mean?

Miller - Direct (Smith)                                        38

1    A.    $80.

2    Q.    Okay.  And then underneath that we see 120hh.  What does

3    that mean?

4    A.    That would mean $120 for a half hour.

5    Q.    Okay.  And under that 200hr.

6    A.    $200 for an hour.

7    Q.    Okay.  There's a line on here that says "Available for"

8    and then it has a check Incall and then the word "Outcall."

9    Are those also code words?

10   A.    Yes.

11   Q.    What does those words mean?

12   A.    Incall would mean that the sex buyer is going to travel to

13   the location of the person being sold for sex.  And outcall

14   means the person being sold for sex would go to the sex buyer's

15   location.

16   Q.    And now I want to touch on something.  You keep using the

17   word women who are sold for sex.  Is that synonymous with the

18   word prostitute?

19   A.    Yes.

20   Q.    And is that a term that you might use to describe a

21   prostitute because as the phrase implies, it's a woman who is

22   being sold, not selling herself?

23   A.    Correct.

24   Q.    Okay.  Now, this advertisement appears to list a phone

25   number.  Do you recognize the phone number on there?

Miller - Direct (Smith)                                          39

1    A.    Yes.

2    Q.    How do you recognize that phone number?

3    A.    That was the undercover phone number I was using.

4    Q.    Okay.  And it says "Text Me."  So any person responding to

5    this ad would have text you if they were interested in this

6    individual?

7    A.    Correct.

8              MS. SMITH:  Thank you, Kathy.

9    BY MS. SMITH:

10   Q.    So did you receive any responses to this advertisement?

11   A.    Yes.  Many.

12   Q.    Well, more specifically did you receive a message from a

13   person with the phone number 402-218-8951?

14   A.    Yes.

15   Q.    Okay.  And was that a text message?

16   A.    Yes.

17   Q.    When did you receive that message?

18   A.    Approximately 7:34 a.m. on March 30th.

19   Q.    Did you respond right away?

20   A.    I don't recall if I responded right away.

21   Q.    Okay.  But at some point, did you engage in a conversation

22   with this person?

23   A.    Yes.

24   Q.    And was that conversation via text message?

25   A.    Yes.

Miller - Direct (Smith)                                          40

1   Q.   For at least a portion of this conversation, were you

2   texting with the person while you were located here in Omaha,

3   Nebraska?

4   A.   Yes.

5   Q.   Did you at some point in time determine who you were

6   texting with?

7   A.   Yes.

8   Q.   How did you do that?

9   A.   Typically we would run the phone number to determine

10  whether it was -- belonged to an actual carrier like U.S.

11  Cellular, Verizon, whoever it might be, and then we run it

12  through a law enforcement database, and then through that I'm

13  able to see if there is a name attached to that phone number,

14  and then I did get a name back on this phone number, and so

15  then I ran that back through our Nebraska Criminal Justice

16  Information System and was able to ID the person that way.

17  Q.   Okay.  So what did you learn about the person who owned

18  that phone number ending in 8951?

19  A.   That his name was Jason Bates.

20  Q.   And because you looked up additional information, did you

21  learn his age?

22  A.   Yes.

23  Q.   How old was he on March 30th of 2020?

24  A.   I believe he was 48 years old.

25  Q.   Did you also learn what kind of vehicle he drove?

Miller - Direct (Smith)                                        41

1    A.    Yes.

2    Q.    And what kind of vehicle was that?

3    A.    It was an early 2000, I think maybe 2002 red Jeep Liberty.

4    Q.    Did the -- did this vehicle have special license plates as

5    well?

6    A.    It did.  It had a Nebraska license plate that said R8DERS.

7    Q.    Okay.

8          MS. SMITH:  Your Honor, may I have permission to

9    approach?

10         THE COURT:  You may.

11         MS. SMITH:  Thank you.

12   BY MS. SMITH:

13   Q.    Deputy Miller, I've handed you what's been marked as

14   Government Exhibit 3.  Do you recognize this exhibit?

15   A.    Yes.

16   Q.    What is this exhibit?

17   A.    A copy of the screenshots of the text messages between the

18   undercover phone number and the phone number ending in 8951.

19   Q.    And whose phones are these screenshots from?

20   A.    These are screenshots from my undercover phone.

21   Q.    Okay.  Do these photos fairly and accurately depict the

22   entire conversation between your undercover phone and the phone

23   number listed as 402-218-8951?

24   A.    Yes.

25         MS. SMITH:  Your Honor, at this time I would move to

Miller - Direct (Smith)                                        42

1   admit Government Exhibit 3.

2           MR. SHAPIRO:  No objection to 3, Your Honor.

3           THE COURT:  Exhibit 3 is admitted.

4           MS. SMITH:  May I approach?

5           THE COURT:  You may.

6           MS. SMITH:  And, Your Honor, at this time I would

7   move to publish Exhibit 3.

8           THE COURT:  You may.

9   BY MS. SMITH:

10  Q.    Now, Deputy Miller, I know the conversation in this case

11  lasted several days.  What was the nature of the conversation?

12  A.    The nature of the conversation was negotiating a price in

13  exchange for sex.

14  Q.    Now, looking at the first page of Exhibit 3, how does the

15  conversation start?

16  A.    The conversation starts with Mr. Bates texting "Hey."

17  Q.    Okay.  And at some point after these pleasantries, what

18  does he ask then?

19  A.    Was looking for some company this evening.

20  Q.    And how did she respond?

21  A.    "I can only do day when my mom's at work."

22  Q.    So it appears she's turning him down?

23          MR. SHAPIRO:  Objection, leading.

24          THE COURT:  Sustained.

25          MS. SMITH:  Kathy, can we go to page 2.

1    BY MS. SMITH:

2    Q.    How does he respond after she says that?

3    A.    "Ok well maybe tomorrow then.  What's the donation."

4    Q.    Now, we spoke of code words.  Is the word "donation," does

5    that have any specific meaning?

6    A.    Yes.

7    Q.    What does that mean?

8    A.    Typically in the commercial sex industry, they'll use the

9    word "donation" to try to make it appear to law enforcement

10   that they don't have to pay money in exchange for the sex.

11   It's just if they want to donate money in exchange for the sex.

12   Q.    So just to see that I'm understanding that correctly,

13   that's a way to make the transaction appear legal?

14   A.    Correct.

15   Q.    Okay.  How did she respond to his question?

16   A.    "How much time?"

17   Q.    And then what does she say after that, after he says "Hhr

18   or hr"?

19   A.    She says 120 or 200.

20   Q.    So that would have been the time, 120 for half an hour of

21   her time or 200 for an hour?

22   A.    That's correct.

23   Q.    Okay.  How does he respond next?

24   A.    By asking her if she parties.

25            MS. SMITH:  Kathy, can we go to page 3.

Miller - Direct (Smith)                                            44

1        For the record, we are now looking at Exhibit No. 3 on

2   page 3.

3   BY MS. SMITH:

4   Q.   How does she respond to his question about partying?

5   A.   "I can depending on what, cant be fucked up when my mom

6   gets home."

7   Q.   So, again, she's mentioning her mother?

8   A.   Correct.

9   Q.   What does he -- what does he say in response?

10  A.   "Smoke some ice."

11  Q.   Now, based on your training and experience as a law

12  enforcement officer, do you know what the word "ice" means?

13  A.   Typically, it would refer to methamphetamine.

14  Q.   So he's asking her to party and smoke some meth with him.

15  A.   Correct.

16  Q.   And how does she respond?

17  A.   That she's never tried it, but she studied it in school

18  this year and it scares her.

19  Q.   And what does he say?

20  A.   That it's not bad.  It just keeps you alert and awake, and

21  he'd have to see if he can come up with that much, that things

22  are tight with the virus.

23  Q.   So as they continue discussing methamphetamine, she

24  mentions school.

25  A.   Correct.

1    Q.    And he continues to indicate that he wants to do

2    methamphetamine.

3    A.    Correct.

4    Q.    Okay.

5          MS. SMITH:  Kathy, can we go to page 4 of Exhibit 3.

6    BY MS. SMITH:

7    Q.    And, finally, how does she respond regarding this

8    methamphetamine discussion?

9    A.    That "maybe it would help me stay awake since school is

10   online now."

11   Q.    And does he appear to agree with her in his next line?

12   A.    Yes.

13   Q.    And does that appear to be the end of their conversation

14   on March 30th of 2020?

15   A.    Yes.

16   Q.    Now, did they continue messaging the next day?

17   A.    Yes.

18   Q.    And who reached out to whom first?

19   A.    Mr. Bates -- Mr. Bates reached out to her.

20   Q.    Okay.  And what does he say when he does reach out to her?

21   A.    "Missed u today.  What times during the day are u

22   available?"

23   Q.    So he's again trying to meet with her?

24   A.    Correct.

25          MS. SMITH:  Go to page 5, please.

Miller - Direct (Smith)                                    46

1         For the record, we're now looking at Exhibit 3, page 5.

2    BY MS. SMITH:

3    Q.   It appears that that was the last part of the conversation

4    on March 31st.  Who initiates the conversation on April 1st?

5    A.   Mr. Bates.

6    Q.   Okay.  So despite her lack of response, he continued

7    initiating contact.

8              MR. SHAPIRO:  Object to the form of the question.

9              THE COURT:  One moment.  I'll sustain it on form.

10   BY MS. SMITH:

11   Q.   Did he continue initiating contact each day?

12   A.   Yes.

13   Q.   Does she provide a response on April 1st?

14   A.   Yes.

15   Q.   And reading through the page, page 5, how does she

16   respond?

17   A.   She says, "Hey, maybe this afternoon."

18   Q.   All right.  And then moving forward what does he say?

19   A.   "What's the latest available."

20   Q.   Okay.  And then her message in response.

21   A.   "Nothing more today, my mom is coming home early.  Can u

22   do mornings, she leaves for work at 9."

23   Q.   So on April 1st she says she can't meet with him.

24   A.   That's correct.

25   Q.   And she again says it's because of her mother.

Miller - Direct (Smith)                                        47

1    A.    Correct.

2    Q.    Okay.  And how does he respond to that?

3    A.    "Ya, I'll text u tomorrow morning."

4    Q.    Okay.  Then what does she say?

5    A.    "Okay, I'll hafta meet u somewhere I can walk cuz Im not

6    old enough to drive yet, text after 9."

7              MS. SMITH:  Kathy, can we now go to page 6.

8         For the record, we are now looking at Exhibit 3, page 6.

9    BY MS. SMITH:

10   Q.    How does he respond when she says that she's not old

11   enough to drive?

12   A.    "I don't go to ur house."

13   Q.    So does he appear to react to her mentioning that she's

14   not old enough to drive?

15   A.    No.

16   Q.    He --  And how -- how does the conversation move on from

17   there?

18   A.    When he asks about going to her house, she responds, "No I

19   can meet u somewhere close I can walk, car or hotel is okay,

20   what is ur age?"

21   Q.    Okay.  And then throughout the rest of the page, do

22   they --

23   A.    Oh -- sorry.

24   Q.    Throughout the rest of the page, do they discuss the area

25   of town?

1    A.    Yes.

2    Q.    Okay.

3          MS. SMITH:  Kathy, can we move to page 7.

4    BY MS. SMITH:

5    Q.    We're now on page 7 of Exhibit No. 3.  When they're

6    discussing about being out west, does she again mention

7    schooling?

8    A.    Yes.  She said she lives close to Millard North High

9    School, that she walks there for school.

10   Q.    So she's indicating she's a high schooler?

11   A.    Correct.

12   Q.    How does he respond to that?

13   A.    Says "Your fairly close I'm by west."

14   Q.    So does he appear to make any comment about the fact that

15   she said she was in high school?

16         MR. SHAPIRO:  I'm going to object.  The exhibit in

17   evidence speaks for itself.

18         THE COURT:  That is sustained.

19   BY MS. SMITH:

20   Q.    Who ends the conversation on April 1st?

21   A.    She ends the conversation asking age and hour or half

22   hour.

23   Q.    And when he didn't respond, did she pester him or try to

24   contact him again?

25   A.    No.

Miller - Direct (Smith)                                          49

1    Q.   On April 2nd, who initiated the conversation?

2    A.   Mr. Bates.

3    Q.   What does he say?

4    A.   "Hey just verifying you are 19 right?  I would hate not to

5    be able to see you if so so please tell me u are 19."

6         MS. SMITH:  Kathy, can we move to page 8, please.

7    BY MS. SMITH:

8    Q.   Based on the time stamps of those two messages, does it

9    appear that they were sent in rapid succession?

10   A.   Yes.

11   Q.   And the please tell me you're 19, does that seem like he's

12   a bit desperate?

13        MR. SHAPIRO:  Objection, speculation.

14        THE COURT:  Sustained.

15   BY MS. SMITH:

16   Q.   How does she respond?

17   A.   She says, "I'm 15, I have to put 19 in the ad or it takes

18   it down.  Thats why I told u Im not old enough to drive so I

19   dont lie to people."

20   Q.   And how does he respond to that?

21   A.   "Know your lying you're 19!  U have to tell me ur 19.  We

22   can meet and talk about it if u like.  When are u free."

23   Q.   Based on your training and experience in handling these

24   types of cases, do you often see people seeking sex services

25   that ask the prostitute whether or not they're old enough?

Miller - Direct (Smith)                                                50

1    A.    Typically, they're not going to ask that specifically

2    unless they think they're dealing with a minor.

3    Q.    Now, at this point, they've been communicating since

4    March 30th so about three days.

5    A.    Correct.

6    Q.    And pursuant to the prior messages we reviewed, did she

7    indicate her age nearly every day?

8              MR. SHAPIRO:  Objection.  The exhibit speaks for

9    itself.  Best evidence.

10             THE COURT:  Overruled.

11   A.    Yes.

12   BY MS. SMITH:

13   Q.    Is this the first time he actually asks her age?

14   A.    Yes.

15   Q.    And how does she respond?

16   A.    "I'm 15, I have to put 19 in the ad or it takes it down.

17   Thats why I told u Im not old enough to drive so I dont lie to

18   people."

19   Q.    And how does he respond to that?

20   A.    "Know your lying your 19!  You have to tell me ur 19.  We

21   can meet and talk about it if u like.  When are u free."

22             MS. SMITH:  Can we go to page 9.

23   BY MS. SMITH:

24   Q.    How does she respond to those messages?

25   A.    "Some guys like Im 15, some dont, but one got mad at me

Miller - Direct (Smith)                                           51

1    for not telling so Im always honest now.  If u want older girl

2    thats okay then u should go find older girl."

3    Q.   And how does he respond to that?

4    A.   "Are you free."

5    Q.   And what does she say?

6    A.   "I have to wait and see.  My mom is working from home, but

7    said she may have to go in to the office for a few hours now."

8            MS. SMITH:  Can we go to page 10.

9        For the record, we're now looking at page 10 of Exhibit

10   No. 3.

11   BY MS. SMITH:

12   Q.   Does she have another message after that?

13   A.   Yes.

14   Q.   And what is she say?

15   A.   "If she does, how much time do u want, where, and what do

16   u want?"

17   Q.   And how does he respond?

18   A.   "Maybe when we hang out for about an hour."

19   Q.   So at the top of the page, she gave him an out.

20           MR. SHAPIRO:  Objection, speculation, form of the

21   question.

22           THE COURT:  I'm going to overrule that.

23   A.   Yes.  When she said if you want an older girl, then you

24   should go find an older girl.

25           MS. SMITH:  Can we go to page 11, please.

Miller - Direct (Smith)                                    52

1    BY MS. SMITH:

2    Q.    I believe the message we left off on was when he said we

3    can hang out for about an hour.

4          What does she say in response to that?

5    A.    "Would b $200.  Car or going someplace?  And what do u

6    want?  I have to know to keep myself safe."

7    Q.    So her response, she mentions $200 and asks what he wants.

8    Is sex ever explicitly mentioned?

9    A.    In the conversation you're talking about up to this point

10   or...

11   Q.    Yes.

12   A.    No.

13   Q.    But similar to we -- to what we discussed earlier, in your

14   training and experience, are the words stating $200 for sex a

15   rarity to see in messages?

16   A.    Yes.

17   Q.    How did he react to her message?

18   A.    Said "Probably here."

19           MS. SMITH:  Can we go to page 12.

20         For the record, we're now looking at page 12 of Exhibit 3.

21   BY MS. SMITH:

22   Q.    And what does she say in response to that?

23   A.    "House, hotel, office?  I dont commit if I dont know what

24   Im agreeing to."

25   Q.    And what does he say?

Miller - Direct (Smith)                                           53

1   A.   "House."

2   Q.   And then what did she say in response?

3   A.   "What r u wanting?"

4   Q.   And what does he say?

5   A.   "Nothing weird."

6        MS. SMITH:  Kathy, can we move to the next page.

7        For the record, we're now looking at page 13 of Exhibit 3.

8   BY MS. SMITH:

9   Q.   How does she respond?

10  A.   "Okay, I dont think Im the girl for u, I dont commit to

11  vague shit.  Thank u anyway tho."

12  Q.   So she declines his offer to meet.

13  A.   Correct.

14       MR. SHAPIRO:  Objection.  Move to strike his answer.

15  That exhibit speaks for itself.

16       THE COURT:  Sustained.  I would ask the jury to

17  disregard the answer just given.

18       MS. SMITH:  Your Honor, may I have a moment?

19       THE COURT:  You may.

20       (An off-the-record discussion was had.)

21  BY MS. SMITH:

22  Q.   Deputy Miller, when you wrote this response, what were you

23  meaning?

24  A.   That she's not interested in meeting with him anymore.

25  Q.   Why?

1    A.    Because she doesn't agree to meet if she's not

2    understanding what the expectations of her are.

3    Q.    Let's take a second to speak again about your training and

4    experience in human trafficking investigations.

5    A.    Okay.

6    Q.    As we went over in the advertisement, there were certain

7    sex acts that the person posting it found acceptable.

8    A.    Correct.

9    Q.    But in the real world, when these women get a client, is

10   that what always happens?

11   A.    No.

12   Q.    Are there dangers involved for these women who are being

13   sold for sex?

14   A.    Yes.

15   Q.    What are some of those dangers?

16   A.    The dangers are getting robbed, getting forced to sex acts

17   that they wouldn't agree to.  It could be getting beaten.  It

18   could be getting abducted.  There's --  It's very dangerous for

19   them.

20   Q.    So based on this, are there some women who will set clear

21   expectations before meeting with a man?

22   A.    Yes.

23   Q.    And what happens if the man refuses to set these

24   boundaries?

25   A.    Then she will not follow through with the meeting.

Miller - Direct (Smith)                                          55

1    Q.   Okay.  Now turning back to these text messages, how does

2    Mr. Bates respond when she says that?

3    A.   "I just don't want to incriminate myself."

4    Q.   What does it mean to incriminate one's self?

5    A.   That he doesn't want to say something that could legally

6    get him in trouble.

7    Q.   What does she say in response?

8    A.   She says, "Okay, and I dont commit to unknown, I learned a

9    bad lesson that way.... good luck, plenty of girls out there."

10   Q.   So by writing this response, you were indicating what you

11   mentioned, that not setting boundaries can get girls into

12   trouble?

13   A.   Correct.

14   Q.   And she told him "good luck, plenty of girls out there."

15   A.   Yes.

16   Q.   How does he respond to this?

17   A.   "I'll get back to you when I'm more sure."

18           MS. SMITH:  Kathy, can we go to the next page.

19       For the record, we are now looking at page 14 of Exhibit

20   No. 3.

21   BY MS. SMITH:

22   Q.   So I believe the first message on this page was that

23   message, "I'll get back to you when I'm more sure."

24   A.   Correct.

25   Q.   After he says that, does she take any action to convince

Miller - Direct (Smith)                                    56

1    him to change his mind?

2              MR. SHAPIRO:  Object to the form of the question.

3              THE COURT:  Overruled.

4    A.   No.

5    BY MS. SMITH:

6    Q.   Does she message him at all again on April 2nd?

7    A.   No.

8    Q.   Who initiates the conversation on April 3rd?

9    A.   Mr. Bates.

10   Q.   What does he say?

11   A.   "Let's get together."  "I can come now."  "You there

12   please text back."  "Hey."  "I want to see u."

13   Q.   Does she respond to any of these?

14   A.   No.

15   Q.   How many hours apart are these?

16   A.   Approximately an hour.

17   Q.   Okay.  So all together from the first one -- oh, never

18   mind.

19             MS. SMITH:  Kathy, can we go to page 15 of Exhibit 3.

20   BY MS. SMITH:

21   Q.   What's the next message he sends her?

22   A.   "I'm in your area."  "I sure wish you would respond to my

23   text."  "U home."

24   Q.   And are those all on April 3rd?

25   A.   Yes.

Miller - Direct (Smith)                                      57

1   Q.   Does she message him at all on April 3rd?

2   A.   No.

3   Q.   Who initiates the conversation on April 4th?

4   A.   Mr. Bates.

5   Q.   And what does he say?

6   A.   "Good morning."  "Hey hope ur ok?"  "Hello."  "Hey."  And

7   "U there?"

8        MS. SMITH:  Can we go to page 16.

9        For the record, we're now looking at page 16 of Exhibit

10  No. 3.

11  BY MS. SMITH:

12  Q.   Those last three messages, the "Hello," "Hey," "U there,"

13  what day did those messages occur?

14  A.   Those occurred on April 5th.

15  Q.   So did she appear to message him at all on April 5th?

16  A.   No.

17       MS. SMITH:  And, I'm sorry, Kathy, going back quickly

18  to page 15.

19       For the record, we're looking at page 15 of Exhibit 3.

20  BY MS. SMITH:

21  Q.   Did she message him at all on April 4th?

22  A.   No.

23  Q.   Okay.  Going back to page 16 of Exhibit 3, who initiates

24  the conversation on April 5th?

25  A.   Mr. Bates.

Miller - Direct (Smith)                                          58

1   Q.   Does she finally respond at some point?

2   A.   On April 6th.

3   Q.   And what does she say?

4   A.   "Sorry, weekend sucked!  Mom made me shut my phone down

5   cuz I didn't get all my school done online.  She went into work

6   for a few hours finally!"

7   Q.   So from April 3rd until April 6th, approximately how many

8   messages did Mr. Bates send her that she didn't respond to?

9   A.   Approximately 13.

10  Q.   Yet he kept messaging her.

11  A.   Correct.

12  Q.   What's her second message she sends on April 6th?

13  A.   "She went into work for a few hours finally!"

14  Q.   And how does he respond?

15  A.   "Want to get together."  "I really want to see u."

16  Q.   So when she did finally respond, did she make mention to

17  her age again?

18  A.   She mentioned didn't get all of her school done online.

19          MR. SHAPIRO:  Objection.  Move to strike,

20  nonresponsive.  It's a yes or no question.

21          THE COURT:  I'll sustain the objection.  You may

22  approach it a different way.

23          MS. SMITH:  Okay.

24  BY MS. SMITH:

25  Q.   When she finally responded, did she make mention to her

Miller - Direct (Smith)                                          59

1    schoolwork?

2    A.   Yes.

3    Q.   Did she also make mention to her mom?

4    A.   Yes.

5              MS. SMITH:  Kathy, can we go to page 17.

6         For the record, we are now looking at page 17 of Exhibit

7    No. 3.

8    BY MS. SMITH:

9    Q.   What does he say to her?

10   A.   "Want to get together."  "I really want to see u."  "U

11   there."

12   Q.   Now I want to take a second to stop again and discuss your

13   training and experience.  Can you explain to the jury what the

14   word "grooming" means?

15   A.   "Grooming," that's commonly a way that an adult may

16   prepare a child for sexual activity.  Oftentimes it's trying to

17   develop a relationship with them or to make something appear

18   less severe than it really is, to try to make something bad not

19   look so bad, I guess.

20   Q.   So in simpler terms, is it a way of manipulating a child?

21   A.   Yes.

22   Q.   Is that sometimes done through emotion?

23   A.   Yes.

24   Q.   And can it be done through emotional phrases, showing

25   friendship?

Miller - Direct (Smith)                                              60

1   A.   Yes.

2   Q.   Based on your training and experience, a grown male

3   reaching out to a child and saying "I really want to see u,"

4   could that qualify as grooming?

5   A.   It could, yes.

6   Q.   And as you testified previously, minors are more

7   vulnerable to this type of crime?

8   A.   Yes.

9   Q.   Going back to page 17 of Exhibit 3, how does she respond

10  after he says, "I really want to see u"?

11  A.   "I want to, but am making sure she is staying at work the

12  whole day.  Still want an hour?"

13  Q.   And how does he respond?

14  A.   "Yes."  "How will you know that."

15       MS. SMITH:  Can we go to page 18, please.

16       For the record, we're looking at page 18 of Exhibit 3.

17  BY MS. SMITH:

18  Q.   What does she say?

19  A.   "Im waiting for her to call, she usually tells me so I

20  know what to do about dinner."

21  Q.   And what does he say?

22  A.   "Think she'll call fairly soon?"

23  Q.   So again they're both discussing her mother not being

24  home?

25  A.   Correct.

Miller - Direct (Smith)                                    61

1    Q.   Okay.  And at the bottom of the page, what does he say?

2    A.   "Earlier the better.  We can hang out at my place, smoke a

3    little and have sex."

4    Q.   Is this the first time he explicitly says he wants to have

5    sex with her?

6    A.   Yes.

7    Q.   And does that message appear in the midst of them speaking

8    about her mom?

9    A.   Yes.

10          MS. SMITH:  Can we go to page 19, please.

11        For the record, we're looking at page 19 of Exhibit 3.

12   BY MS. SMITH:

13   Q.   How does she respond to that?

14   A.   "I'll let u know as soon as I hear, I may or may not smoke

15   today cuz my mom might notice, can u pick me up?"  "Also, sex

16   is broad, just condom everything okay?  And no ass."

17   Q.   Does he agree to that?

18   A.   Yes.

19   Q.   So he agrees to using condoms and picking her up.

20   A.   Correct.

21          MS. SMITH:  Can we go to page 20, please.

22        For the record, we are looking at page 20 of Exhibit

23   No. 3.

24   BY MS. SMITH:

25   Q.   On page 20, do they continue discussing the meeting and

Miller - Direct (Smith)                                    62

1    him picking her up?

2    A.   Yes.

3    Q.   And does he continue to try to convince her to smoke?

4    A.   Yes.

5    Q.   In what message does he say that?

6    A.   Where he says, "She won't notice a few puffs."

7    Q.   Okay.  Can you read her message at the bottom of the page?

8    A.   "OMG," which would be oh my God, "Im trying but if I text

9    or call her too much she'll be suspicious."

10   Q.   When you responded in this way, what was your intention?

11   A.   To basically just -- she was telling him just chill out,

12   I'm trying, but if I text her too much, she's going to know

13   something's up.

14   Q.   So in other words, your response was because you were

15   feeling Mr. Bates was pressuring with the texts?

16          MR. SHAPIRO:  Objection.  That is speculation and the

17   form and it's leading.

18          THE COURT:  I'll sustain that objection.

19   BY MS. SMITH:

20   Q.   Was Mr. Bates's sending you a substantial number of texts

21   regarding his [sic] mom before you sent this response?

22          MR. SHAPIRO:  Objection.  The exhibit speaks for

23   itself.  Best evidence.

24          THE COURT:  I'm going to sustain the objection.

25          MS. SMITH:  Can we go to page 21, please.

Miller - Direct (Smith)                                        63

1    BY MS. SMITH:

2    Q.   How does she respond?

3    A.   Starting at the top again?

4    Q.   Let's start at the message that was sent at 1:14 p.m.

5    A.   She says, "Not great but not terrible, she wont be home

6    until 4, so I have to b back by 3 to be safe."

7    Q.   And what does he say?

8    A.   "Should I come now."

9    Q.   Do they appear to figure out a time and place to meet?

10   A.   Yes.

11   Q.   And where is that?

12   A.   At the Kum & Go on Pacific Street near Millard North.

13   Q.   Okay.

14        MS. SMITH:  Can we move to page 22.

15        For the record, we're looking at page 22 of Exhibit No. 3.

16   BY MS. SMITH:

17   Q.   In the middle of the page, what does she say?

18   A.   "Yes, I can walk to there by like 154th Street."

19   Q.   So again she's mentioning walking?

20   A.   Correct.

21   Q.   And does he agree?

22   A.   Yes.

23   Q.   What does he say?

24   A.   "What time."

25   Q.   And what does she say in response to that?

Miller - Direct (Smith)                                          64

1    A.    "Now is fine, text when there & I'll come over, I live

2    close."

3              MS. SMITH:  Can we go to page 23.

4         We're now looking at page 23 of Exhibit No. 3.

5    BY MS. SMITH:

6    Q.    Towards the middle of the page, what does she say?

7    A.    "Can u get me some shooters to relax me in case I dont

8    smoke?"

9    Q.    So she's asking for another favor of him?

10   A.    Correct.

11   Q.    And how does he respond?

12   A.    "What kind."

13   Q.    Does she tell him what kind?

14   A.    Yes, "something cinnamon like fireball."

15   Q.    Okay.

16             MS. SMITH:  Can we go to page 24.

17        For the record, we're now looking at page 24 of Exhibit

18   No. 3.

19   BY MS. SMITH:

20   Q.    And how does he respond to that?

21   A.    By asking "How many."

22   Q.    Okay.  And then what is his next message to her?

23   A.    That he's a couple minutes away.

24   Q.    And does she ask what kind of car he's driving?

25   A.    Yes.

Miller - Direct (Smith)                                                    65

1    Q.   And does he tell her?

2    A.   Yes, a Jeep.

3            MS. SMITH:  Can we go to page 25.

4    BY MS. SMITH:

5    Q.   Does he ask how he'll recognize her?

6    A.   Yes.

7    Q.   And what does she say?

8    A.   A "pink T and shorts" and she'll walk in the Kum & Go and

9    go use the bathroom and then walk out.

10   Q.   And then what does she say?

11   A.   Asks if he's got the shooters already.

12   Q.   Okay.  And what does he say in response?

13   A.   "Ya."

14   Q.   And what's the last message?

15   A.   "On my way."

16   Q.   Is that the last message that occurred between you and

17   Mr. Bates?

18   A.   Yes.

19   Q.   Now, on April 6th of 2020 when these messages were

20   occurring, were you and other law enforcement officers with the

21   Douglas County Sheriff's Office preparing in case Mr. Bates

22   agreed to meet with the minor?

23   A.   Yes.

24   Q.   What did those preparations entail?

25   A.   They entailed having -- we have a surveillance van with

1    multiple camera angles that would set up in the area ahead of

2    time, and I would be in the area to maintain texting, and then

3    we would have maybe two to three other plainclothes

4    investigators that would be in unmarked cars, and then we would

5    also have an officer that had a uniform or the marked vest in a

6    marked cruiser nearby.

7    Q.   And what did you personally do near the end of the text

8    conversation?

9    A.   I was just in the area maintaining the texting.

10   Q.   And we previously discussed that you looked up Mr. Bates

11   with his phone number.

12   A.   Correct.

13   Q.   So were you aware what type of vehicle you were watching

14   for?

15   A.   Yes.

16   Q.   And did you also have a driver's license photo of

17   Mr. Bates?

18   A.   Yes.

19   Q.   So as you were there at the Kum & Go as 154th and Pacific,

20   did you observe the vehicle registered to Mr. Bates arrive?

21   A.   I don't recall if I observed it where -- where I was at,

22   but if I didn't specifically, then people would be relaying

23   that over the radio.

24   Q.   Okay.  And did another officer perform a traffic stop on

25   Mr. Bates' vehicle?

Miller - Direct (Smith)                                          67

1    A.   Yes.  Where he was parked in front of the Kum & Go.

2    Q.   Who was driving that vehicle?

3    A.   Lieutenant Will Niemack.

4    Q.   Okay.  And who was in Mr. Bates' vehicle?

5    A.   Mr. Bates.

6    Q.   Was there anyone else in the vehicle with him?

7    A.   No.

8    Q.   Did you make contact with Mr. Bates?

9    A.   Yes.

10   Q.   Do you see Mr. Bates in the courtroom here today?

11   A.   Yes.

12   Q.   Can you point to where he's sitting and identify an item

13   of clothing that he's wearing.

14   A.   Yes.  He's sitting to my left and he's wearing a -- it

15   looks like a short-sleeved black polo.

16         MS. SMITH:  Your Honor, let the record reflect that

17   the witness has identified the defendant.

18         THE COURT:  So noted.

19   BY MS. SMITH:

20   Q.   At that point, was Mr. Bates placed in your vehicle?

21   A.   Yes.

22   Q.   Did you -- or were you intending to interview Mr. Bates?

23   A.   Yes.

24   Q.   Prior to the interview, did you read Mr. Bates his Miranda

25   rights?

1    A.    Yes.

2    Q.    Did he agree to speak with you?

3    A.    Yes.

4    Q.    Did he sign a form stating that?

5    A.    Yes.

6              MR. SHAPIRO:  If you want to just offer 4, I have no

7    objection.

8              MS. SMITH:  Okay.  Your Honor, at this time I would

9    like to admit Government Exhibit No. 4.

10             MR. SHAPIRO:  No objection, Your Honor.

11             THE COURT:  Okay.  Exhibit 4 is admitted.

12             MS. SMITH:  And I would move to publish, Your Honor.

13             THE COURT:  You may.

14   BY MS. SMITH:

15   Q.    Is this the waiver of rights form that Mr. Bates signed?

16   A.    Yes.

17   Q.    And that has his signature at the bottom?

18   A.    Yes.

19   Q.    Was your interaction with Mr. Bates recorded?

20   A.    Yes.

21             MS. SMITH:  Your Honor, may I approach the witness?

22             THE COURT:  You may.

23   BY MS. SMITH:

24   Q.    Deputy Miller, I've handed you what's been marked as

25   Government Exhibits 5 and 19.  Do you recognize first Exhibit

Miller - Direct (Smith)                                              69

1    No. 5?

2    A.   Yes.

3    Q.   Is that a copy of the entire interview you recorded with

4    Mr. Bates on April 6th?

5    A.   Yes.

6    Q.   Is that a true and accurate copy of that interview?

7    A.   Yes.

8            MS. SMITH:  Your Honor, at this time I would move to

9    admit Government Exhibit 5.

10           MR. SHAPIRO:  No objection to 5, Your Honor.

11           THE COURT:  Exhibit 5 is admitted.

12   BY MS. SMITH:

13   Q.   And Government Exhibit 19, is that specific portions of

14   that interview that you completed on April 6th of 2020?

15   A.   Yes.

16   Q.   Is that a true and accurate copy of specific portions of

17   that interview?

18   A.   Yes.

19           MS. SMITH:  Your Honor, I would move to admit

20   Government Exhibit 19.

21           MR. SHAPIRO:  I have no objection to 19, Your Honor.

22           THE COURT:  Exhibit 19 is admitted.

23           MS. SMITH:  May I approach?

24           THE COURT:  You may.

25           MS. SMITH:  And, Your Honor, I would seek permission

Miller - Direct (Smith)                                        70

1    to publish both of those exhibits.

2                 THE COURT:  You may.

3                 MS. SMITH:  Can we play Exhibit 19, please.

4         For the record, we're showing Exhibit No. 19.

5         (A portion of Exhibit No. 19 was played.)

6    BY MS. SMITH:

7    Q.   Was this the first -- or what was the first question you

8    asked Mr. Bates?

9    A.   What brought him to the Kum & Go that day.

10   Q.   And what was his answer?

11   A.   Prostitution.

12   Q.   Did he indicate how often he sought out prostitutes?

13   A.   I think he said occasionally.

14   Q.   Did he indicate that it wasn't frequently?

15   A.   Yes.

16        (A portion of Exhibit 19 was played.)

17   BY MS. SMITH:

18   Q.   So in response to your question about how old the girl,

19   did he state how old the girl said she was?

20   A.   No.

21   Q.   What did he respond instead?

22   A.   How old the profile said she was on Skip the Games.

23   Q.   Okay.

24        (A portion of Exhibit 19 was played.)

25   BY MS. SMITH:

Miller - Direct (Smith)                                          71

1   Q.   So he indicated to you that he didn't believe the girl was

2   15.

3   A.   Correct.

4   Q.   Based on that response, did you decide to go get his phone

5   and review the messages with him?

6   A.   Yes.

7           MS. SMITH:  Your Honor, may I approach?

8           THE COURT:  You may.

9   BY MS. SMITH:

10  Q.   Deputy Miller, I've been -- handed you what's been marked

11  as Government Exhibit 14.  Do you recognize this exhibit?

12  A.   Yes.

13  Q.   What is it?

14  A.   A black Apple iPhone with a clear case found in

15  Mr. Bates's possession.

16  Q.   Is this the phone that was in Mr. Bates' car that you went

17  and retrieved and reviewed with him?

18  A.   Yes.

19          MS. SMITH:  Your Honor, at this time I would move to

20  admit Government Exhibit 14.

21          MR. SHAPIRO:  There's no objection to 14, Your Honor.

22          THE COURT:  Exhibit 14 is admitted.

23          MS. SMITH:  May I approach?

24          THE COURT:  You may.

25       (A portion of Exhibit 19 was played.)

Miller - Direct (Smith)                                    72

1   BY MS. SMITH:

2   Q.   So Mr. Bates admitted he was at least concerned about her

3   age.

4   A.   Correct.

5   Q.   And yet did he arrive at the gas station?

6   A.   Yes.

7   Q.   And he claimed that if he had figured out she was actually

8   15 that he wouldn't have had sex with her?

9   A.   Yes.

10   Q.   What did he say he would have done instead?

11   A.   "I would have been more of a father figure."

12   Q.   Did he explain to you how he would have been a father

13   figure in this 15-year-old girl's life?

14   A.   No.

15   Q.   He stated he had concerns, but did he explain to you how

16   he would have figured out what her real age was once he picked

17   her up?

18   A.   No.

19   Q.   Now, going back to the messages, the text messages that we

20   discussed, throughout this entire text conversation, did he

21   ever seek any type of documentary verification of her age?

22   A.   No.

23   Q.   Did he ask to see an identification document like a school

24   ID?

25   A.   No.

Miller - Direct (Smith)                                    73

1    Q.   Did he ask to see a passport?

2            MR. SHAPIRO:  Objection.  Asked and answered by the

3    first question which covered everything.

4            THE COURT:  Overruled.

5    A.   No.

6    BY MS. SMITH:

7    Q.   Did he ask to see an unfiltered picture of her face to get

8    a better grasp on her age?

9    A.   No.

10   Q.   Did he ask any type of question to address his concerns

11   that she could actually be 15?

12   A.   Well, just stated that he wanted her to tell him that she

13   was 19, otherwise, no.

14   Q.   And then despite of his concerns, he showed up to the

15   Kum & Go at 154th and Pacific.

16   A.   Correct.

17   Q.   And he told you that he simply didn't believe her.

18   A.   Right.

19   Q.   And that how he was somehow going to be able to verify her

20   age once they met so they could go over to his house and have

21   sex.

22   A.   Can you repeat that, please.  I'm sorry.

23   Q.   Yeah, sure.  So he indicated that he was somehow going to

24   verify her age during the time period that he picked her up and

25   took her back to his house with the intent to have sex with

Miller - Direct (Smith)                                    74

1   her?

2           MR. SHAPIRO:  Objection.  That's not what the

3   evidence shows based on the audio and video.

4           THE COURT:  Sustained.

5   BY MS. SMITH:

6   Q.   Well, based on the messages, he was intending to pick her

7   up?

8   A.   Yes.

9   Q.   And was he intending to take her back to his house?

10          MR. SHAPIRO:  Objection, leading her own witness.

11          THE COURT:  Sustained.

12  BY MS. SMITH:

13  Q.   In the messages, did they agree to go back to the house?

14  A.   Yes.

15  Q.   And when Mr. Bates messaged you, did he state it was his

16  intent to have sex?

17          MR. SHAPIRO:  Objection.  It's leading and not the

18  best evidence.

19          THE COURT:  One moment.  Overruled.

20  A.   Yes.

21          THE COURT:  Ms. Smith, when it'd be a good time for

22  you to break in your questioning, it's about time for our

23  afternoon break.

24          MS. SMITH:  That's certainly fine, Your Honor.

25          THE COURT:  Okay.  Ladies and gentlemen of the jury,

Miller - Direct (Smith)                                              75

1    at this point in time, we are going to take a 15-minute break.

2    It's 2:27 p.m.  What we will do is we will break until

3    2:45 p.m. which is just a few minutes over 15 minutes.

4        So during that time I just remind you of my prior

5    admonition to you.  Namely, you're not allowed to discuss this

6    case with each other or anyone else, no texting, no nothing on

7    the Internet at all about this case.

8        So at this point in time, I would like everyone to rise as

9    the jury leaves the courtroom.

10       (Jury out at 2:28 p.m.)

11            THE COURT:  Mr. Miller, you may be excused for our

12   break as well.

13            THE WITNESS:  Thank you.

14            THE COURT:  Counsel may be seated for one moment.

15       Counsel, is there anything that we need to address now

16   that the jury is out of the courtroom before we take our break

17   for the afternoon break?  I'll start with the United States,

18   Ms. Smith.

19            MS. SMITH:  Nothing for the government.  Thank you.

20            THE COURT:  Okay.

21            MR. SHAPIRO:  No, Your Honor.  Thank you.

22            THE COURT:  Okay.  All right.  At this point in time,

23   we will recess until 2:45 p.m.

24       Thank you.

25       (Recess taken at 2:29 p.m.)

Miller - Direct (Smith)                                  76

1          (At 2:45 p.m. on November 16, 2021; with counsel and the

2     defendant present; WITHOUT the jury:)

3               THE COURT:  Counsel, is there anything we need to

4     address before we bring the jury back in?  Ms. Smith.

5               MS. SMITH:  No, Your Honor.

6               THE COURT:  Mr. Shapiro.

7               MR. SHAPIRO:  No, Your Honor.

8               THE COURT:  Please bring in the jury.

9          (Jury present at 2:46 p.m.)

10              THE COURT:  You may be seated.

11        Ms. Smith, if you can please bring the witness back up.

12              MS. SMITH:  Certainly.  Thank you.

13           CHAD MILLER, PREVIOUSLY SWORN, RESUMED THE STAND

14              THE COURT:  Mr. Miller, I'll just remind you that you

15    remain under oath.

16              THE WITNESS:  Yes, Your Honor.

17              THE COURT:  Please proceed.

18              MS. SMITH:  Thank you, Your Honor.

19        For the record, when we went on break, we were reviewing

20    Exhibit No. 19.

21        (A portion of Exhibit 19 was played.)

22              MS. SMITH:  At this time I'd like to pull up

23    Exhibit 5 beginning at minute 14.

24              THE COURT:  Please proceed.

25              MS. SMITH:  Thank you.

Miller - Direct (Smith)                                          77

1           (A portion of Exhibit 5 was played.)

2                     DIRECT EXAMINATION RESUMED

3     BY MS. SMITH:

4     Q.   Now, Deputy Miller, this meeting occurred on April 6th of

5     2020; is that right?

6     A.   Correct.

7     Q.   Okay.  Regarding the timing of this interview, what was

8     going on in Omaha and across the country?

9     A.   COVID.

10    Q.   And how did that impact kids specifically?

11    A.   There was a lot of kids that were at home unsupervised

12    doing online school.

13    Q.   Now, based on your job as a deputy for the Douglas County

14    Sheriff's Office and as a task force officer for the FBI, did

15    that raise specific concerns for you?

16            MR. SHAPIRO:  Objection, relevance, for purposes of

17    this trial.

18            THE COURT:  Overruled.

19    A.   Yes.  The task force received an email from the FBI

20    stating that due to this they're seeing an increase of online

21    enticement.

22            MS. SMITH:  May I publish Exhibit No. 19 again?

23            THE COURT:  You may.

24         (A portion of Exhibit 19 was played.)

25    BY MS. SMITH:

Miller - Direct (Smith)                                              78

1    Q.   Deputy Miller, at some point in the interview, did you

2    discuss some of the items that Bates had brought with him to

3    meet the girl?

4    A.   Yes, I believe so.

5    Q.   Did you ask him whether he had picked up the Fireball

6    Whisky?

7    A.   Yes.

8    Q.   What did he say?

9    A.   Yes.  That he had picked it up at a different Kum & Go.

10   This one we were at was at 154th and Pacific.  He said he

11   thought it was the one around 192nd and Pacific.

12   Q.   So after the interview ended that day, did law enforcement

13   with Douglas County Sheriff's Office receive a copy of the

14   surveillance video at that gas station?

15   A.   Yes.

16              MS. SMITH:  Your Honor, may I approach the witness?

17              THE COURT:  You may.

18              MR. SHAPIRO:  If you'd like to just offer it, I'm not

19   going to object.

20              MS. SMITH:  Certainly.

21         Your Honor, at this time the government moves to admit

22   Government Exhibit 13.

23              MR. SHAPIRO:  There'd be no objection to 13, Your

24   Honor.

25              THE COURT:  Exhibit 13 is admitted.

Miller - Direct (Smith)                                        79

1    BY MS. SMITH:

2    Q.   During the interview, did Mr. Bates additionally indicate

3    whether he had brought money with him?

4    A.   Yes.

5            MS. SMITH:  Your Honor, may I approach?

6            THE COURT:  You may.

7            MR. SHAPIRO:  If you'd like to just offer that

8    exhibit, you certainly can.

9            MS. SMITH:  Your Honor, at this time I'd move to

10   admit Government Exhibit 12.

11           MR. SHAPIRO:  No objection to 12, Your Honor.

12           THE COURT:  Twelve is admitted.

13           MS. SMITH:  Your Honor, may I publish?

14           THE COURT:  Yes, you may.

15   BY MS. SMITH:

16   Q.   Deputy Miller, are these the two $100 bills that you

17   pulled from Mr. Bates' wallet that day?

18   A.   I believe so, yes.

19   Q.   And is this the amount that Mr. Bates agreed to pay the

20   minor?

21   A.   Yes.  I'm sorry, yes.

22   Q.   Did you ask him whether he had any condoms on his person?

23   A.   Yes.

24   Q.   And what did he say?

25   A.   No.

Miller - Direct (Smith)                                              80

1    Q.   Did he state that he had condoms?

2    A.   I asked if he had some at home and he said yes.

3    Q.   Was there anything else of interest located in Mr. Bates's

4    vehicle?

5    A.   There was a prescription.

6    Q.   And what was the prescription for?

7    A.   I believe it was sildenafil, but I looked it up, and it

8    was -- it's the generic Viagra, but I believe it's sildenafil.

9    Q.   Now, we reviewed the text messages and you were

10   discussing -- or you and Mr. Bates were texting from March 30th

11   until April 6th.  Why not just make a quick deal with

12   Mr. Bates?

13   A.   It could be numerous reasons.  One would be that the --

14   you know, the dialogue was continuing over time which would

15   help me gauge how serious he was about pursuing somebody that

16   he was told was 15.  To give him an opportunity to think about

17   it, I guess, over a period of time.  Other things could be

18   logistical reasons like whether or not we had personnel to meet

19   with somebody so there could be various reasons.

20   Q.   And did you also -- or at times in these investigations,

21   do you sometimes purposefully delay responding to the person

22   seeking sex?

23   A.   Yes.

24   Q.   Why?

25   A.   Well, if I purposefully delay it, it's just again to -- to

Miller - Direct (Smith)                                           81

1    not reach out to that person, I guess, and give them time to

2    see if after thinking about it if they're going to continue to

3    pursue the 15-year-old.

4    Q.   And as we discussed in the text messages, there were two

5    different times -- or how many times did you tell Mr. Bates he

6    could find another girl?

7    A.   I think there was two different times when I made a

8    reference of if you want an older girl, just go find an older

9    girl, and then the other one would be something similar to

10   there's plenty of older girls out there maybe or something to

11   that effect.

12   Q.   And when you're investigating these sorts of cases, why do

13   you make those sorts of statements?

14   A.   It gives them an opportunity -- like we call it an out,

15   but it gives them an opportunity to -- to leave the

16   conversation and to not contact her again, and so sometimes

17   I'll even take that a step further by actually saying --

18   suggesting if you want an older girl, then go get an older

19   girl.

20            MS. SMITH:  One moment, please, Your Honor.

21        May I consult with counsel?

22            THE COURT:  You may.

23        (An off-the-record discussion was had.)

24            MS. SMITH:  Your Honor, the government passes this

25   witness subject to recall at a later time.

1          THE COURT:  Okay.  Any cross-examination?

2          MR. SHAPIRO:  I do, Your Honor.

3          THE COURT:  Okay.  Please proceed.

4          MR. SHAPIRO:  Thank you.

5          THE COURT:  And I'll invite the witness -- since you

6   may be recalled, I'll just remind you that -- well, first of

7   all, we're going to start with the cross-examination.  Once

8   your examination is continued -- is completed, I'll just remind

9   you, if I don't remind you then, that you may be recalled so

10  please proceed.

11          THE WITNESS:  Yes, Your Honor.

12                        CROSS-EXAMINATION

13  BY MR. SHAPIRO:

14  Q.   Good afternoon, Deputy.

15  A.   Good afternoon.

16  Q.   So let me get this right.  You post an ad on Skip the

17  Games, correct?

18  A.   Correct.

19  Q.   And it's an ad for prostitution, correct?

20  A.   Yes, it's an ad that we pattern after other ads on

21  there --

22  Q.   Okay.

23  A.   -- for prostitution.

24  Q.   Okay.  In regard to patterning other ads, you post an ad

25  soliciting prostitution for that particular fake individual

1    you're covering as, right?

2    A.   Yes.

3    Q.   And you already told us that Skip the Games has no other

4    purpose except for prostitution, correct?

5    A.   Correct.

6    Q.   So all the people posting, we'll just say in this case

7    mostly females offering sex for certain prices, that's --

8    that's what they're on there for is they're -- they're letting

9    people know they're prostitutes and you can find me online,

10   true?

11   A.   That's what the ads are saying; however, each individual

12   purpose -- person's purpose for being on there may not be the

13   same.

14   Q.   Okay.  What was your purpose of your ad?

15   A.   Well, one of the ways that we combat trafficking against

16   minors is we have to mimic the best that we can how that

17   actually happens in the real world.

18   Q.   Okay.  I'll ask a better question.

19   A.   Okay.

20   Q.   The purpose of your ad to the general public when they

21   look at it would be to engage in sex with that profile for

22   certain prices.

23   A.   Well, the exact purpose of my ad is for us to identify men

24   that are willing to pay a minor for sex.

25   Q.   All right.  Let's talk about the ad.  It's Exhibit 2.  I

1    don't need it up.  You're well familiar with it, aren't you?

2    A.    Enough.

3    Q.    The title is Kitty Loves to PURRRR, right?

4    A.    Correct.

5    Q.    And you post different things saying you want this, I got

6    what you want, those sort of things, right?

7    A.    Correct.

8    Q.    And basically say that you accept cash for payment,

9    correct?

10   A.    Correct.

11   Q.    Also on Exhibit 2 you actually list prices for the amount

12   of time to engage in sex with you, correct?

13   A.    Well, to engage in sex with a 15-year-old, yes.

14   Q.    Okay.  Which is you in this case, right?

15   A.    Posing as, yes.

16   Q.    And is there anything about this ad on here that says

17   you're a minor?

18   A.    There's things in the ad that typically may indicate it,

19   but there's nothing in there, no, that says, hey, I'm a minor.

20   Q.    Is there anything in Exhibit 3 where you say, I don't want

21   to have sex, stop bothering me?

22   A.    Exhibit 3 being the text messages?

23   Q.    That'd be correct.

24   A.    There's a couple occasions where she says that -- trying

25   to do it from memory -- I don't think that I'm the girl for

Miller - Cross                                                          85

1    you.

2    Q.   Which implies --

3    A.   Thank you -- thank you anyway.  Also saying there's other

4    girls out there so there's, yes, statements --

5    Q.   Okay.

6    A.   -- saying not interested.

7    Q.   Well, actually when you say I'm not the girl for you, that

8    means you're the girl for other people, just not this

9    Mr. Bates.  That's a fair interpretation, isn't that?

10   A.   Could be based on, yeah, his behavior that she's not.

11   Q.   And on this ad, you list activities that the provider,

12   which is you or the fake 15-year-old, likes to have done,

13   correct?

14   A.   Correct.

15   Q.   Mm-hmm.  Let's talk about those.  Face sitting?

16   A.   Yes.

17   Q.   What's that?

18   A.   So face sitting, that would be when the female sits on the

19   male's face.

20   Q.   Okay.  And the second one says "Intercourse - Vaginal."  I

21   think that's self-explanatory, right, Deputy?

22   A.   I think so.

23   Q.   Okay.  How about oral and then it says receiving?  That

24   means you're posting an ad telling these people if they pay a

25   certain price, it's listed, you like to have oral sex performed

1    on you.  That's what that says, isn't it?

2    A.    Yes.  The user --

3    Q.    That's a yes or no.

4    A.    Okay.

5    Q.    Then the next service you like or might provide under your

6    ad is "Intercourse - Oral."  That's kind of self-explanatory

7    too, isn't it?

8    A.    I agree.

9    Q.    And once again, your ad says for 80qv or 120hh or 200hh,

10   whoever responds to this ad can enjoy these services for these

11   prices.  That is what this says.  True or false?

12   A.    That's what that says.

13   Q.    Kissing.  That's the other activity you -- you enjoy on

14   your list, right?

15   A.    Correct.

16   Q.    And how about rimming?  That's on there too, right?

17   A.    Yes.

18   Q.    You like receiving rimming.  That's what it says.

19   A.    Correct.

20   Q.    And, again, based on this ad, if someone likes to give

21   others rims or rim jobs it's called, right, they just have to

22   pay these prices and during that quick visit, half hour, hour,

23   they can engage in all these sexual things that you list.  True

24   or false?

25   A.    At her discretion.

1    Q.    Okay.  At her discretion.  But you posted this ad on a

2    prostitution website saying I'm available for these prices for

3    these acts.  Is that -- am I accurate or am I being wrong

4    somewhere here?

5    A.    No.  That's correct.

6    Q.    And, again, the ad describes specific different acts, at

7    least five or six, seven, right?

8    A.    Yes.

9    Q.    Prices for those.

10   A.    Yes.

11   Q.    For the certain time frame, right?

12   A.    Correct.

13   Q.    The government spent some time going through Exhibit

14   No. 3.  Those would be the text messages exchanges.  You recall

15   that, right?

16   A.    Yes.

17   Q.    I don't need it up in front of me.  I'll bring it to you

18   if you need it, but at page 10 of Exhibit 3, you say in

19   reference to if your mom's going to be gone, "If she does, how

20   much time do u want, where, and what do u want?"  That's what

21   you were saying to Mr. Bates, isn't it?

22   A.    Correct.

23   Q.    You don't see anywhere in there "I don't want to engage in

24   sex 'cause I'm only 15," do you?  It's a yes or no question.

25   A.    Well, I don't think it is.  It's hard without a context to

Miller - Cross                                                                88

1    be able to say -- I feel like it would be an incomplete answer,

2    a yes or no would be.

3    Q.   Well, you've -- you familiarized yourself with Exhibit 3,

4    I assume, the text message conversation?

5    A.   Yes.

6    Q.   Can you tell me is there anywhere in here where you say

7    no, I don't want to have sex?

8    A.   In other words, yes.  She says, I'm not the person for

9    you, go find an older girl, no thank you, thanks anyway.  So

10   they're just other phrasings of no.

11   Q.   Page 11 of that exhibit, you ask, "House, hotel or [*sic*]

12   office?  I dont commit if I don't know what Im agreeing to."

13        Do you recall saying that, right?

14   A.   Yes.

15   Q.   So you are willingly engaging in a conversation with

16   Mr. Bates about a sex act for a certain price at a certain

17   location.  That's what you're doing here.  True or false?

18   A.   Yes, that is the context of the text conversation.

19   Q.   And when you say in response to my previous question,

20   well, I -- I said maybe I'm not the girl for you, that also

21   implies that you're the girl for someone else.  Other people

22   may like that, maybe not Mr. Bates, true?

23   A.   Well, that could be, yes.

24   Q.   Page 13 of Exhibit 3.  You say, "I dont commit to vague

25   shit."  Right?

1    A.    Yes.

2    Q.    That means you want the person on the other end to agree

3    to a certain amount of time and price and for what sex act

4    before you'll agree to meet them.  True or false?

5    A.    True.

6    Q.    The government's counsel spent a lot of time going through

7    those messages and asking who initiated the call or the

8    conversation on this day and that date.  You remember that,

9    right?

10   A.    Yes.

11   Q.    If you need to see this in front of you, Deputy, you just

12   let me know, but it appears to me on page 16 of Exhibit 3, the

13   first conversation from April 6th is from you.  You initiate

14   that conversation, don't you?  It's where you say -- just to

15   help you out -- "Sorry, weekend sucked!  Mom made me shut my

16   phone down cuz I didn't get all my school done online."

17   A.    So that would have been a response to his 13 unanswered

18   text messages.

19   Q.    From the previous day?

20   A.    Previous three days.

21   Q.    So my question to you is who initiates the conversation on

22   April 6th?

23   A.    She does.

24   Q.    Which is you?

25   A.    Correct.

1    Q.    And page 17 of that same Exhibit 3.  There's a question.

2    My client says, I want -- he actually questions do you want to

3    get together, I want to see you.  And your reply is I want to

4    but I'm making sure she is staying at work the whole day,

5    referencing your mom.

6          Do you recall that?

7    A.    Yes.

8    Q.    So you basically say I want to do this, right?

9    A.    Where is that in context to the times that she said no?

10   I'm not sure on that.

11   Q.    Well, regardless of whether you say no ten times before,

12   I'm asking about this conversation which is April 6th, the date

13   that you initiated the contact.  You say, "I want to."  What

14   are you referring to?  What does that mean?

15   A.    To meet --

16   Q.    It means you want to meet for sex.  Right?

17   A.    Correct, to meet.

18   Q.    At the various prices that you posted here whether it be a

19   quickie, a half hour, or a full hour, right?

20   A.    Yes, referencing the negotiation that was going on in the

21   conversation.

22   Q.    Yeah.  Basically, when you post this ad like you did,

23   regardless of the person's age 'cause we'll get to that at some

24   point, this says that you are ready, willing, and able to have

25   sex for these prices and doing these things.  True or false?

1    A.    Again, I don't think it's a one-word answer.

2    Q.    Well, what am I getting wrong?  This is a ad on a

3    prostitution website where you specifically set out time frames

4    of a quickie, a half hour, or an hour, the prices for that, and

5    the sex acts that may be done during those times.

6          What am I missing?

7    A.    That the reason that law enforcement or myself would post

8    that ad is because we need to mimic how minors are trafficked

9    and sold for sex online.  That's the closest we can do it and

10   that is the method that we use to try to identify people who

11   are willing to pay minors for sex.

12   Q.    After some of your experiences with these cases, have you

13   ever thought about maybe trying a different way of going about

14   this?

15   A.    We have multiple ways that we combat sex trafficking of

16   minors.  This is just one.

17   Q.    So just 'cause I want to try to get this answer out of

18   you, Deputy Miller.  This is your ad, right?

19   A.    Yes.

20   Q.    You post different time frames for sex, right?

21   A.    Correct.

22   Q.    And prices for each of those hours or half hours or

23   quickies that you want, right?

24   A.    Correct.

25   Q.    And certain sex acts that you'll either do or you like

1    done on -- to you.  We know who the "you" is.

2    A.    I understand.

3    Q.    That's clearly what this ad says, right?

4    A.    Yes.

5    Q.    Ready, willing, and able to perform any of these acts for

6    these prices.  That's what this says, right?

7    A.    Yes.

8    Q.    Page 19 of Exhibit 3, which we know by now is the text

9    conversation.  You say, "Sex is broad, just condom everything

10   okay?  And no ass."  You remember that?

11   A.    Yes.

12   Q.    Okay.  So you're basically telling at least in this case

13   Mr. Bates that you're willing to have sex as long as it's at

14   these prices but no ass.  Am I missing something there?

15   A.    That's correct.

16   Q.    Once again, you, this person, ready, willing, and able to

17   engage in sex acts for a certain price but no ass, correct?

18   A.    Yes.

19   Q.    Face sitting is okay, right?

20   A.    Yes.  At her discretion.

21   Q.    And rimming's okay?

22   A.    Yes.

23   Q.    At her discretion.

24   A.    Right.

25   Q.    So long as you comply with paying a certain price for the

1    amount of time necessary to do these things, right?

2    A.   Well, so long as it's somebody that she's willing to meet

3    with, that she feels comfortable to meet with.  That's the way

4    it works in the real world and that's what we're mimicking.

5    Q.   So in this case when you say to Mr. Bates maybe I'm not

6    the right person for you, you're not declining having sex for

7    these prices.  You're just saying to him maybe we're just not a

8    good hookup?

9    A.   Typically, it would be that the sex buyer's making the

10   person feel uncomfortable or unsafe is -- is what we find in

11   interviewing victims.

12   Q.   Took my client's phone?

13   A.   Yes.

14   Q.   You took his phone, didn't you?

15   A.   Correct.

16   Q.   People who have --  And you looked through it really well,

17   right?  I mean not you personally or maybe, but you and other

18   law enforcement professionals whose jobs are tasked with going

19   through these phones, that was done, right?

20   A.   Through the extraction, yes.

21   Q.   Okay.  Generally, people who have sex with minors, we have

22   a name for them, don't we?

23   A.   Yes.

24   Q.   Pedophile, right?

25   A.   Correct.  Depending on what they like.

1    Q.    Okay.  Generally, an adult who has sex with children, we

2    call that a pedophile.

3    A.    Correct.

4    Q.    Sex with minors, right?

5    A.    Correct.

6    Q.    And based on your training and experience, true or false,

7    pedophiles like to keep child porn, they like to have that

8    handy either on a computer, phone, magazines.  True or false?

9    A.    So you're asking me is that a hundred percent true or a

10   hundred percent false?

11   Q.    I'm just saying generally do pedophiles tend to look at

12   and like child porn?

13   A.    Look at, yes; and in my experience, it's a mix of whether

14   or not they keep it.

15   Q.    Okay.  Did you find any child porn on Mr. Bates' phone?

16          MS. SMITH:  Objection, beyond the scope.

17          THE COURT:  I'll sustain that.

18   BY MR. SHAPIRO:

19   Q.    Okay.  Did you execute a search warrant at my client's

20   house after you arrested him?

21   A.    No.

22   Q.    After reviewing his phone, did you find anything untawdry

23   [*sic*] about things on his phone?

24   A.    Untawdry?

25   Q.    Things you would arrest him for.

1   A.    Simply the evidence for our investigation.

2   Q.    Okay.  Well, as a well-rounded investigator who's looking

3   out for children, which you told us which is a good thing, by

4   the way, protecting children from child porn kind of be like

5   right up near the top of that list of things, wouldn't it?

6   A.    For the task force, it is, yes.

7   Q.    Okay.  Was my client arrested for possessing any child

8   porn?

9   A.    No.

10  Q.    If you found any on his phone, would he have been?

11  A.    He would have been charged, yes.

12  Q.    No search warrant executed at his home, though, right?

13  A.    Correct.

14  Q.    Have you authored search warrant affidavits for courts

15  previously where you wanted to go search the home or business

16  of a target that you have either arrested or are about to?

17  A.    Not in the context of these investigations, but as

18  investigations as a whole, yes, I've done that before.

19  Q.    Because part of your gambit as a -- in the work you do,

20  child porn's a big deal.  It's a problem, isn't it?

21  A.    It's not my specific assignment, but yes, you're right, it

22  is.

23  Q.    You certainly wouldn't turn a blind eye to it.  You would

24  either act on it or turn it over to some other law enforcement

25  person in your task force to follow up, right?

Miller - Cross                                                    96

1    A.    Correct.

2    Q.    None of that applied to Mr. Bates, though, did it?

3    A.    No.

4    Q.    You downloaded his phone and search history, correct?

5    A.    Correct.

6    Q.    No surprise.  He visited quite a few prostitution sites,

7    true?

8    A.    True.

9          MS. SMITH:  Your Honor, objection.  Beyond the scope

10   of direct.

11         THE COURT:  I'll sustain that objection.

12   BY MR. SHAPIRO:

13   Q.    After going through the entirety of my client's phone

14   which pretty much you looked at everything, didn't you?

15   A.    As much as the software would extract, yes.  It's not

16   everything but...

17   Q.    Aside from the charge brought today, was he arrested for

18   any offense involving matters on his phone that you found?

19   A.    No.

20   Q.    Can you point specifically to any evidence in this case as

21   a lead agent where my client had to induce, persuade, or entice

22   this person to do the things that they willingly posted they

23   would do?  Can you point that to the jury so we can take a peek

24   at that?

25   A.    Well, I would say during the times that she said no thank

1    you, I'm not the girl for you, go find an older girl, that the

2    message that that was sending was I'm not interested.  So I

3    would say that Mr. Bates following that up with 13 text

4    messages over the course of three days would be trying to

5    persuade her that maybe he is the person for her or that he is

6    safe to meet with.  It's a negotiation.

7    Q.    Do you ever use the words "I'm not interested" anywhere in

8    there?  It's a yes or no question.

9    A.    Well, we discussed that.  It's --  Those exact words, no.

10   Other words like no thank you, thanks anyway, though.

11   Q.    You're --

12   A.    Go find another girl.

13   Q.    Right.  You're now giving the jury your interpretation of

14   what you meant by those things.  That's what you're expanding

15   upon, true?

16   A.    Well, it's a conversation, and these are the way -- so

17   other undercover that I've done is working as a sex buyer and

18   communicating back and forth with people that are being sold

19   for sex.  This is the nature of these conversations.

20   Q.    So after you say that maybe I'm not the girl for you, you

21   then go on to after that saying you don't commit to anything

22   unless you get the details.

23   A.    Correct.

24   Q.    Right?

25         And you don't want anything -- no "vague shit," your

1    words.  You want specifics.  Time, place, how much, and what do

2    you want.  You want to hear that and then you'll decide we'll

3    go make the meeting, right?

4    A.    In -- in these negotiations, that is the way that a sex

5    buyer persuades a person being sold for sex that they are a

6    safe person to be with, that they have the money.

7    Q.    Okay.  Well, I'm not talking about like in generalities or

8    mimicking other stuff.  I'm talking about the cold hard facts

9    of this case and what these words say.

10   A.    And I understand.  But the whole premise of this

11   investigation is to mimic actual situations to seek out men

12   that would pay a minor for sex and so that's --

13   Q.    So you want to -- you want to lure them in.  You yourself

14   want to entice them to come to these sites, right?

15   A.    Well, opposite of that --

16   Q.    That's a yes or no.

17   A.    No.

18   Q.    Oh.  It sounds like just what you said, I think.

19   A.    Well, in context that's why I would tell them go find an

20   older girl, no thank you, I'm not the girl for you.  That is to

21   push them away.  Mr. Bates chose to come back.

22   Q.    Well, he chose to come back even though August 6th you

23   initiated that contact.  We've already covered that territory,

24   right?

25   A.    In response to 13 unanswered texts, we did, yes.

1    Q.    Okay.  Why not -- why just not respond at all?

2    A.    Because again it's -- it's an investigation.  He is

3    pursuing her and so I'm going to respond back.  That's how we

4    again identify people in the community that will pursue paying

5    a minor for sex.

6    Q.   By the way, Deputy, are you aware that the Exhibit 15,

7    which will be coming into evidence later, the cell phone

8    extraction for websites is 291 pages?

9    A.    I would believe that it is.  I know it was a lot of

10   information.

11   Q.    All right.  And no -- no evidentiary value out of those

12   291 pages came out of there?  Is that fair or not?

13   A.    Evidentiary in what sense?  I guess lots of escort stuff,

14   but I want to more specifically know what you mean.

15   Q.    It was all escort stuff.

16   A.    Correct.

17   Q.    Right.  Do you have any information as you sit here that

18   any of these were minors?

19            MS. SMITH:  Your Honor, objection.  Beyond the scope

20   of direct.

21            THE COURT:  I will sustain that objection.

22   BY MR. SHAPIRO:

23   Q.    After reviewing all the evidence in this case, including

24   Exhibit 15, and the phone extraction, my client charged with

25   any other sex with minors or enticement that you're aware of?

1    A.    No.

2    Q.    I'm just about done, Deputy, and for the Court's knowledge

3    and the jury's.

4          Back to Exhibit 3, the texting conversations.  At the top

5    of page 17, which is April 6th, after you reached out to him,

6    he says, "You [*sic*] want to get together."  "I really want to

7    see u."  Are you there?  And your response again is, "I want

8    to."

9          Do you remember that?

10   A.    Yes.

11   Q.    All this other testimony you've given about, well, I tried

12   to deflect him saying I'm not the girl for you.  On that date

13   on August 6th, after you reached out to him first and he says,

14   I want to get together, your response is, "I want to."

15         That's true, isn't it?

16   A.    Yes.

17   Q.    And as it references the whole conversation in this ad,

18   that would suggest that you want to get together to engage in

19   the various sex acts you list at different prices assuming you

20   can come to terms, fair?

21   A.    I would say it references what we talked about in their

22   conversation.

23   Q.    Which is in -- all of this is in response to the ad you

24   posted.  True or false?

25   A.    Initially, yes.

Miller - Cross                                                      101

1    Q.   A prostitution ad, correct?

2    A.   Yes.

3    Q.   Willing to do these sex acts for these prices for these

4    various times, correct?

5    A.   Again, based on the female's discretion on how the

6    conversation goes is how it works so, yes.

7    Q.   Okay.  So you, she, ready, willing, and able to do all

8    these things so long as you -- you say it's fine, you vetted

9    the person to make sure they're not some stalker or killer

10   who's going to kidnap you.  Because these people don't know

11   you're a cop, do they?

12   A.   No.

13   Q.   Okay.

14   A.   They think I'm a 15-year-old girl.

15   Q.   Right.  Who is saying on the ad I'm ready, willing, and

16   able to have sex with you and these acts for these prices.

17   That's what that says, right?

18   A.   Yes.

19        MR. SHAPIRO:  Just one moment, if I may, please, Your

20   Honor.

21        Thank you, Deputy Miller.  That's all the

22   cross-examination I have at this time.

23        THE WITNESS:  Thank you.

24        THE COURT:  Thank you.

25        Ms. Smith, any redirect examination?

1              MS. SMITH:  Yes, Your Honor.

2                        REDIRECT EXAMINATION

3    BY MS. SMITH:

4    Q.   Deputy Miller, on cross-examination you were asked quite a

5    bit about the advertisement and the fact that it indicated the

6    girl was 19.

7         With women who are sold for sex who are underage, do they

8    regularly indicate that their age is 19?

9    A.   Typically, they're going to use a younger age, yes, like

10   19.

11   Q.   I'm sorry, I meant women who are underage being sold for

12   sex.  Will they indicate that they are 19 on the website?

13   A.   Yes.

14   Q.   Why?

15   A.   Well, because on most of the sites, they would get -- the

16   ad would get taken down if they indicated that they were under

17   the age of 19 or 18.

18             MS. SMITH:  Your Honor, may I publish Government

19   Exhibit No. 2?

20             THE COURT:  You may.

21   BY MS. SMITH:

22   Q.   Reviewing Government Exhibit No. 2 again, how old does she

23   indicate she is on this web page?

24   A.   Nineteen.

25   Q.   Okay.  Now, in your professional experience, have you

1   reviewed advertisements that have been set up from minors on

2   this website?

3   A.   Yes.

4   Q.   And is this advertisement, Government Exhibit No. 2, set

5   up to be similar to what other minors have posted that you have

6   seen?

7   A.   Yes.

8   Q.   Does this web page have indicators that she might be a

9   minor?

10  A.   Yes.

11  Q.   And now moving --

12       MS. SMITH:  Thank you, Kathy.

13  BY MS. SMITH:

14  Q.   Now, moving to the text conversation, how soon was a

15  reference made to the girl's age?  If it would be easier for

16  you, would you like me to pull up Exhibit No. 3?

17  A.   Yes.

18       MS. SMITH:  Kathy.

19       Your Honor, may I publish Exhibit 3?

20       THE COURT:  You may.

21       MS. SMITH:  Thank you.

22  BY MS. SMITH:

23  Q.   I'll reask the question.  How soon in the conversation

24  does the female make any reference to her age?

25  A.   Early in the conversation on the first day stating "I can

1    only do day when my mom's at work."

2    Q.   And throughout the conversation does she continue to make

3    references to her age?

4    A.   Yes.

5    Q.   At one point, does she explicitly say I'm 15?

6    A.   Yes.

7    Q.   And despite that did Mr. Bates continue to try to arrange

8    a meeting?

9    A.   Yes.

10   Q.   Now, you described different occasions when you gave

11   him -- you called it an out.

12        MS. SMITH:  Can we go to Government Exhibit 3 at page

13   10.

14   BY MS. SMITH:

15   Q.   Do you see one of those outs on this page?

16   A.   Yes.

17   Q.   Can you read it, please.

18   A.   "Some guys like Im 15, some dont, but one got mad at me

19   for not telling so Im always honest now.  If u want older girl

20   thats okay then u should go find older girl."

21   Q.   And what was his immediate response?

22   A.   "Are you free."

23   Q.   Can we now go to page 13.

24        Deputy Miller, do you see another one of those outs on

25   this page?

1    A.    Yes.

2    Q.    What does it say?

3    A.    The first one is, "Okay, I dont think Im the girl for u, I

4    dont commit to vague shit.  Thank u anyway tho."

5    Q.    Okay.  And at the bottom of the page -- or what's his last

6    message on the bottom of this page?

7    A.    "Let's get together."

8    Q.    So again he continues to try to pursue the girl.

9    A.    Correct.

10   Q.    Now, there was a lot of conversation during

11   cross-examination about the things that the girl said she was

12   willing to do.

13         In your training and experience, have you reviewed a large

14   number of these types of transactions?

15   A.    Yes.

16   Q.    Are these types of conversations in your experience

17   one-sided?

18             MR. SHAPIRO:  Objection, leading.

19             THE COURT:  I'll overrule the objection.

20   A.    No.

21   BY MS. SMITH:

22   Q.    How do they usually go?

23   A.    Well, it's a negotiation back and forth, and oftentimes

24   the sex buyer's trying to figure out is this a cop, the person

25   being sold for sex is trying to figure out is this person safe,

1    are they actually going to have the money, and then oftentimes

2    in my experience in actual investigations in these, if the

3    person being sold for sex indicates --

4            MR. SHAPIRO:  Judge, I'm going to object and move to

5    strike his phrase "person being sold for sex."  These are

6    prostitution websites where these people are voluntarily

7    putting their wares online for prices.  To say they're being

8    sold for sex is disingenuous, move to strike.

9            THE COURT:  That motion is overruled.  And if you

10   have an extended objection in the future, I'd ask that we do a

11   sidebar so please proceed.

12   A.   So it's two-sided in that the person buying the sex is

13   also trying to persuade the person being sold that it's going

14   to be a safe transaction and that they're going to get what

15   they need out of it.

16   BY MS. SMITH:

17   Q.   Okay.  Now, regarding this conversation specifically, were

18   there things Mr. Bates did to persuade the minor?

19   A.   Yes.

20   Q.   Does he agree to buy her alcohol?

21   A.   Yes.

22   Q.   Does he agree to the price?

23   A.   Yes.

24   Q.   Now, even further let's go --

25           MS. SMITH:  Can you pull up page 14.

1    BY MS. SMITH:

2    Q.   Does this appear to be part of that string of messages?

3    A.   Yes.

4    Q.   I want to focus on the second to last message -- full

5    message that we can see from the bottom.  What does that say?

6    A.   "I want to see u!!"

7    Q.   And as we discussed previously, based on your training and

8    experience, could that be considered grooming?

9         MR. SHAPIRO:  Objection.  That would be leading.

10        THE COURT:  Sustained.

11   BY MS. SMITH:

12   Q.   In your training and experience, could this be considered

13   grooming?

14        MR. SHAPIRO:  Same objection.

15        THE COURT:  Overruled.

16   A.   Yes.

17        MS. SMITH:  Can we go to page 17, please.

18   BY MS. SMITH:

19   Q.   Now, on cross-examination Mr. Shapiro pointed out the

20   message in the middle of the page where the female says, I want

21   to, but I'm [*sic*] making sure she's at work.

22        What does he say two lines before that?

23   A.   "I really want to see u."

24   Q.   So, again, we see him saying "I really want to see u"?

25   A.   Correct.

Miller - Redirect (Smith)                                        108

```
1   Q.   Did he additionally offer her drugs?

2   A.   Yes.

3   Q.   In your training and experience in sex trafficking crimes,

4   is offering drugs a form of persuasion?

5   A.   Yes.

6             MS. SMITH:  Your Honor, may I have a moment?

7             THE COURT:  You may.

8        (An off-the-record discussion was had.)

9             MS. SMITH:  No further questions.

10            THE COURT:  As I mentioned to you previously,

11   Mr. Miller, you are subject to recall so I'll just advise you

12   not to discuss your testimony with any other witness.  You are

13   excused but still subject to being recalled.  You may leave.

14            THE WITNESS:  Thank you, Your Honor.

15            THE COURT:  Ms. Smith, your next witness.

16            MS. SMITH:  One moment, Your Honor.  Your Honor, at

17   this time the United States calls Douglas County Sheriff's

18   Office Deputy Joshua Echtinaw to the stand.

19            THE COURT:  Mr. Echtinaw, if you'd please come up

20   here to the stand and you can stand next to the witness chair

21   and our courtroom deputy will swear you in.

22            THE WITNESS:  Yes, Judge.

23            COURTROOM DEPUTY:  Please state your full name for

24   the record and spell your full name.

25            THE WITNESS:  Joshua Dean Echtinaw.  Last name
```

1    E-c-h-t-i-n-a-w.

2              COURTROOM DEPUTY:  And your first name, please.

3              THE WITNESS:  Joshua.

4              COURTROOM DEPUTY:  Please spell it.

5              THE WITNESS:  J-o-s-h-u-a.

6              COURTROOM DEPUTY:  Please raise your right hand.

7              JOSHUA ECHTINAW, PLAINTIFF'S WITNESS, SWORN

8              THE COURT:  Mr. Echtinaw, you may be seated and if

9    you wish, you can take your mask off during your testimony.

10             THE WITNESS:  Thank you, Judge.

11                       DIRECT EXAMINATION

12   BY MS. SMITH:

13   Q.   Good afternoon, Mr. Echtinaw.  Can you tell the jury how

14   you're currently employed.

15   A.   I'm a deputy with the Douglas County Sheriff's Office.

16   Q.   And how long have you been in law enforcement?

17   A.   Five and a half years.

18   Q.   How long in this -- this current assignment?

19   A.   Two years now.

20   Q.   What are your job duties as a deputy with the Douglas

21   County Sheriff's Office?

22   A.   I investigate vice, narcotics, and organized crime related

23   offenses.

24   Q.   Were you employed in that capacity in April of 2020?

25   A.   Yes.

1   Q.   Were you involved in a prostitution investigation between

2   approximately April [*sic*] 30th of 2020 and April 6th of 2020?

3   A.   Yes.

4   Q.   Were you made aware that Deputy Miller was receiving text

5   messages from a phone number ending in 8951?

6   A.   Yes.

7   Q.   Did you learn of an arrangement to meet between Deputy

8   Miller, who was acting as the UC, and the suspect?

9   A.   Yes.

10   Q.   What was the meeting location?

11   A.   The Kum & Go about 154th and Pacific.

12   Q.   And what was your role in this investigation?

13   A.   I was electronic surveillance.

14   Q.   So did you go to the location?

15   A.   Yes.

16   Q.   And what did you do?

17   A.   I set up the electronic surveillance vehicle for

18   electronic monitoring recording.

19   Q.   Were you made aware what type of vehicle you were watching

20   for?

21   A.   Yes.

22   Q.   How were you made aware of that?

23   A.   During the briefing.

24   Q.   Can you describe for the jury what a briefing entails.

25   A.   A briefing entails what the operation is, what time, the

1   location, suspect, if we have a suspect, any listed vehicles,

2   and then what potential enforcement actions are to happen.

3   Q.   When you were conducting surveillance at the Kum & Go at

4   154th and Pacific, were you recording what you were observing

5   in any way?

6   A.   Yes.

7   Q.   How?

8   A.   We have a electronic recording system called ViewCommander

9   that uses several different cameras to record the surroundings

10  of the vehicle.

11  Q.   And when you were doing this surveillance, did you observe

12  the suspect's vehicle arrive?

13  A.   Yes.

14  Q.   Okay.  And was that captured on your camera?

15  A.   Yes.

16           MS. SMITH:  Your Honor, may I approach?

17           THE COURT:  You may.

18  BY MS. SMITH:

19  Q.   Deputy Echtinaw, I've handed you what's been marked as

20  Government Exhibit 6.  Do you recognize this exhibit?

21  A.   Yes.

22  Q.   What is it?

23  A.   This is a surveillance disc from the camera from 154th and

24  Pacific.

25  Q.   Is this the -- a true and accurate copy of the

Echtinaw - Direct (Smith)                                                    112

1   surveillance video you recorded on April 6th of 2020?

2   A.   Yes.

3            MS. SMITH:  Your Honor, at this time I would move to

4   admit Exhibit 6.

5            MR. SHAPIRO:  No objection to 6, Your Honor.

6            THE COURT:  Exhibit 6 is admitted.

7            MS. SMITH:  Your Honor, may I approach?

8            THE COURT:  You may.

9            MS. SMITH:  Your Honor, at this time I would move to

10  publish Government Exhibit 6.

11           THE COURT:  You may.

12        (Exhibit 6 was played.)

13  BY MS. SMITH:

14  Q.   Deputy Echtinaw, in the left-hand middle of the video,

15  there appears to be a red Jeep.  Was that the suspect vehicle?

16  A.   Yes.

17  Q.   Based on your surveillance, did he get out of the vehicle

18  at any time?

19  A.   Yes.  Once law enforcement made contact.

20  Q.   Okay.  So at some point -- as we're watching the video, at

21  some point does law enforcement make contact with him?

22  A.   Yes.

23  Q.   Is that the law enforcement vehicles approaching?

24  A.   Yes.

25  Q.   And at that point in time, was he taken into custody?

1    A.    Yes.

2    Q.    So based on your surveillance, before these vehicles

3    approached and he was taken into custody, did anyone else enter

4    his vehicle?

5    A.    No.

6    Q.    Did anyone leave his vehicle?

7    A.    No.

8            MS. SMITH:  No further questions, Your Honor.

9            THE COURT:  Cross-examination.

10           MR. SHAPIRO:  Your Honor, I have no cross-examination

11   of Deputy Echtinaw.

12           THE COURT:  Okay.  Deputy Echtinaw --  I'll ask the

13   prosecution.  Does this -- does this witness need to remain

14   available for later testimony?

15           MS. SMITH:  No, Your Honor.

16           THE COURT:  Okay.  May the witness be released from

17   the defense's perspective?

18           MR. SHAPIRO:  Of course, Your Honor.

19           THE COURT:  Okay.  Deputy Echtinaw, your testimony is

20   complete.  If you'd put on your mask, you may leave the

21   courtroom.  Just remind you that you may not discuss your

22   testimony with any other witness.

23           THE WITNESS:  Thank you, Judge.

24           THE COURT:  Ms. Smith, your next witness.

25           MS. SMITH:  Your Honor, at this time the government

1   calls Douglas County Sheriff's Office Lieutenant William

2   Niemack.

3           THE COURT:  Mr. Niemack, you may come on up here to

4   the witness stand, stand next to the witness chair, and at that

5   point in time, the courtroom deputy will swear you in.

6           THE WITNESS:  Okay.  Thank you, sir.

7           COURTROOM DEPUTY:  Please state your full name for

8   the record and spell your full name.

9           THE WITNESS:  William Charles Niemack.  W-i-l-l-i-a-m

10  C-h-a-r-l-e-s N-i-e-m-a-c-k.

11          WILLIAM NIEMACK, PLAINTIFF'S WITNESS, SWORN

12          THE COURT:  Officer, you may be seated and if -- you

13  may remove your mask during your testimony if you wish.

14          THE WITNESS:  Thank you.

15                        DIRECT EXAMINATION

16  BY MS. SMITH:

17  Q.   Good afternoon, Officer Niemack.  Can you tell the jury

18  how you're currently employed.

19  A.   I'm a lieutenant with Douglas County Sheriff's Office.

20  Q.   And how long have you worked in law enforcement?

21  A.   All together with Douglas County and also Kearney Police

22  Department since 1997.

23  Q.   And how long have you been in your current assignment?

24  A.   I've been with the sheriff's office since December 6th,

25  1999, and I've been assigned as a lieutenant for the past three

1    years, as a narcotics and K-9 interdiction sergeant for five

2    years prior to that, and the ten years prior to that, I was a

3    criminal investigator as a deputy.

4    Q.    What are some of your job duties as a lieutenant with the

5    Douglas County Sheriff's Office?

6    A.    My current assignment is as the commander for the criminal

7    investigation division.  That division has four teams.  One of

8    which is the vice, narcotics, and organized crime unit, excuse

9    me.  They're responsible for the narcotics and vice or human

10   trafficking related investigations.

11       And then three other teams which include the K-9

12   interdiction unit, the criminal or major crimes unit, and also

13   the crime suppression unit.

14   Q.    Okay.  As part of your duties, were you involved in a

15   prostitution investigation between approximately March 30th of

16   2020 and April 6th of 2020?

17   A.    Yes.

18   Q.    Were you aware that Deputy Miller was receiving text

19   messages from a phone number ending in 8951?

20   A.    Yes.

21   Q.    Did you learn of an arrangement to meet between Deputy

22   Miller acting as an undercover officer and the suspect?

23   A.    Yes.

24   Q.    What was the location of that meeting?

25   A.    It was at a Kum & Go convenience store located near 155th

1    and Pacific Street.

2    Q.    And what was your role in this operation?

3    A.    As lieutenant I was the commander in charge of the overall

4    supervision of the operation, and in this particular operation,

5    I also -- due to the need of a uniform person at the scene, I

6    dressed in full uniform and was in a marked cruiser.

7    Q.    At some point in time, did you go to the agreed-upon

8    location?

9    A.    Yes.

10   Q.    Did you -- Prior to going to the location, were you

11   debriefed and made aware of what vehicle you were looking for?

12   A.    Yes.

13   Q.    Were you also made aware of who the suspect was?

14   A.    Yes.

15   Q.    When you were at the meeting location, did you observe

16   Mr. Bates's vehicle in the area?

17   A.    I was parked away from the location because I was in a

18   marked unit, but our surveillance units noted the vehicle

19   arriving and called out the plate number which matched the

20   information that we had during the briefing and had consistent

21   and constant visual of that vehicle.

22   Q.    So what did you do then?

23   A.    Once I was notified that the vehicle had parked at that

24   convenience store, then I moved from that concealed location to

25   make contact with the occupants of the vehicle.

1    Q.   And was it you personally that made contact with the

2    occupant of the vehicle?

3    A.   Yes.  The initial contact was me.

4    Q.   Okay.  And how many occupants were there in that vehicle?

5    A.   One.

6    Q.   Who was it?

7    A.   It was the person that we had expected, Jason Bates.

8    Q.   Now, when you made contact with Mr. Bates, did you ask

9    Mr. Bates to step out of his vehicle?

10   A.   Yes.

11   Q.   Okay.  Were you -- excuse me.  What happened then?

12   A.   Myself, Deputy Jason Stehlik and Sergeant Travis Whitten

13   were at the driver's side door of the vehicle.  We asked

14   Mr. Bates to exit the vehicle.  At that time I placed handcuffs

15   on Mr. Bates and escorted him away back towards my -- where the

16   marked unit or the cruiser was parked.

17   Q.   Do you see Mr. Bates in the courtroom today?

18   A.   I do.

19   Q.   Can you point out where he's sitting and identify a item

20   of clothing he's wearing.

21   A.   He's seated to my left at the table with a black polo

22   shirt.

23        MS. SMITH:  Your Honor, let the record reflect that

24   the witness has identified the defendant.

25        THE COURT:  So noted.

1          MS. SMITH:  No further questions.

2          THE COURT:  Any cross-examination?

3          MR. SHAPIRO:  Your Honor, I have no questions of

4    Lieutenant Niemack.  He may be excused.

5          THE COURT:  All right.  And, Ms. Smith, may this

6    witness be excused from the subpoena?

7          MS. SMITH:  Yes, Your Honor.

8          THE COURT:  Officer Niemack, your testimony is

9    completed.  I just remind you, you may not discuss your

10   testimony with any other witness in this case.  You are

11   released.  Thank you.

12         THE WITNESS:  Thank you, sir.

13         THE COURT:  Ms. Smith, your next witness.

14         MR. KLEINE:  Your Honor, if I may, at this time the

15   government would call Sergeant Travis Whitten of the Douglas

16   County Sheriff's Office and I will conduct that examination.

17         THE COURT:  Okay.  Thank you.

18       Officer Whitten, you may come up here to the witness stand

19   and stand right next to the witness chair and at that point the

20   courtroom deputy will swear you in.

21         COURTROOM DEPUTY:  Please state your full name for

22   the record and spell your full name.

23         THE WITNESS:  Travis L. Whitten, W-h-i-t-t-e-n.

24         COURTROOM DEPUTY:  Please spell your first name.

25         THE DEFENDANT:  Oh, I'm sorry.  Travis, T-r-a-v-i-s.

1          TRAVIS L. WHITTEN, PLAINTIFF'S WITNESS, SWORN

2          THE COURT:  Officer, you may be seated.  You may

3    remove your mask if you wish during your testimony.

4        You may proceed, Mr. Kleine.

5          MR. KLEINE:  Thank you, Your Honor.

6                        DIRECT EXAMINATION

7    BY MR. KLEINE:

8    Q.   Sergeant Whitten, would you please introduce yourself to

9    the members of the jury.

10   A.   Sergeant Travis Whitten.  I work for the vice, narcotic,

11   and human trafficking unit in the Douglas County Sheriff's

12   Office.

13          THE COURT:  And, Officer Whitten, would you just

14   scoot forward so that microphone is closer to your mouth.

15          THE WITNESS:  Sorry.

16          THE COURT:  Thank you.

17   BY MR. KLEINE:

18   Q.   Sergeant, how long have you held that position?

19   A.   I've been in that position for two years.

20   Q.   Can you tell the jury some of the duties and

21   responsibilities that you have on a day-to-day basis.

22   A.   As I -- I said, I supervise narcotics transactions and

23   human trafficking operations, do surveillance, and other video

24   surveillance type tasks.

25   Q.   You mentioned human trafficking.  Does that also include

1    child exploitation related criminal activity?

2    A.   Yes.

3    Q.   And are those crimes that occur -- that you investigate

4    occur within the Douglas County area in Nebraska?

5    A.   Yes.

6    Q.   Sergeant, I want to turn your attention to April 6th of

7    2020.  Were you involved in an investigation at that point in

8    time involving an individual identified as Jason Bates?

9    A.   Yes.  Deputy Chad Miller was the investigating officer in

10   that case and I was his supervisor.

11   Q.   Can you tell the jury specifically what your role was in

12   that investigation on April 6th of 2020?

13   A.   I was in charge of overall operational security as far as

14   the -- the operation that was done at the Kum & Go for Chad's

15   operation.  I was also involved with taking pictures of

16   evidence and property.

17   Q.   Let's take that one step at a time.  The April 6th, 2020,

18   date, did you have an understanding as to that being the date

19   that Mr. Bates was supposed to meet up with Deputy Miller who

20   was acting in an undercover capacity?

21   A.   Yes.

22   Q.   And you indicated that this meet-up -- was it scheduled to

23   occur at a Kum & Go type gas station?

24   A.   That's correct.

25   Q.   And is that gas station located in Omaha, Nebraska?

Whitten - Direct (Kleine)                                          121

1    A.    Yes, it is.

2    Q.    Around 154th and Pacific?

3    A.    Yes.

4    Q.    You mentioned that your role with regard -- or one of your

5    roles with that investigation was operational security.  Can

6    you explain for the jury what that means?

7    A.    So as for the operation, we just make sure that for

8    officer safety and -- and public safety that we have enough

9    officers in the -- on the -- in the location.  We have enough

10   officers that can actually observe and identify who we're

11   looking for and -- and make sure that the whole operation goes

12   in a safe capacity where nobody gets hurt.

13   Q.    Prior to you performing the work you identified on that

14   investigation that day, was there a briefing with other

15   officers to discuss the various roles that each was to have?

16   A.    Yes.  We always do an operational briefing prior to the

17   event.

18   Q.    At some point, however, did you go to a staging area near

19   the Kum & Go at 154th and Pacific Street?

20   A.    We -- we went -- the staging area because it's -- it is

21   already close to the sheriff's office was getting set up at

22   the -- at the Kum & Go or in the surrounding areas within a

23   couple blocks.

24   Q.    At some point, however, you did, I assume, travel to the

25   154th and Pacific location?

1   A.   Yes.

2   Q.   When you arrived in that area, were you stationed within

3   the confines of the parking lot or were you somewhere else?

4   A.   I moved around.  Where people --  Some people were in the

5   parking lot.  I was a couple blocks away, and then just prior

6   to Mr. Bates arriving, then I moved into the parking lot and

7   that's where I parked.

8   Q.   How were you dressed that day?

9   A.   I was in plain clothes.

10  Q.   And is there a reason for that?

11  A.   Just so we don't stand out to the public.

12  Q.   Were you in a marked cruiser that had lights or were you

13  in more of a -- a plain type car that was -- appeared to be

14  normal for the parking lot?

15  A.   I was in a plain vehicle.  We had one marked cruiser in

16  the area to make contact, but I was in a plain vehicle.

17  Q.   At some point that day, did Mr. Bates show up?

18  A.   Yes.

19  Q.   Do you recall whether that was in the morning or the

20  afternoon time?

21  A.   It was in the afternoon.

22  Q.   So it was light out?

23  A.   Yes.

24  Q.   Did you have an opportunity to observe the vehicle that he

25  was driving?

1    A.    Yes, I did.

2    Q.    And can you describe that vehicle?

3    A.    It was a red -- smaller red Jeep SUV.  It stood out

4    because it had plates -- license plates that said -- it's

5    supposed to mean Raiders on that.

6    Q.    When Mr. Bates arrived at that location, did he park the

7    vehicle?

8    A.    Yes.

9    Q.    After he parked the vehicle, was he then encountered by

10   other law enforcement officers?

11   A.    Yes.

12   Q.    Were you part of that initial encounter?

13   A.    Yes.

14   Q.    Tell us about what happened when you initially encountered

15   Mr. Bates.

16   A.    So it was called out that the vehicle and the subject that

17   we believed we were looking for had showed up at the -- at the

18   convenience store.  At that point the marked vehicle to ensure

19   that they know who -- that we're sheriffs came in and parked

20   directly in front of Mr. Bates's vehicle, activated its lights,

21   and then myself and another deputy who were dressed in plain

22   clothes also approached the vehicle.

23   Q.    When you approached the vehicle, did you have some sort of

24   badge like you are wearing today to show that you were law

25   enforcement?

1    A.    Yes, I was wearing this exact badge.

2    Q.    Did you have the opportunity to interact with Mr. Bates

3    that day?

4    A.    I was standing next to him, but I don't recall having any

5    significant conversations with him.

6    Q.    Do you recognize Mr. Bates in the courtroom here today?

7    A.    Yes.

8    Q.    Can you identify where he's seated and identify an article

9    of clothing that he's wearing.

10   A.    At the defense table in a black polo shirt.

11          MR. KLEINE:  Your Honor, we'd ask the record reflect

12   that the witness has identified the defendant.

13          THE COURT:  So noted.

14   BY MR. KLEINE:

15   Q.    After you encountered Mr. Bates, was he then taken away

16   from his vehicle?

17   A.    He was.

18   Q.    And what's the purpose of that?

19   A.    It's just -- again, it's an officer safety thing where we

20   take out and detain, and then based upon the investigation that

21   Deputy Miller had done, that we -- he talks to them, tries to

22   interview them.

23   Q.    Okay.  So Mr. Bates is removed from that area that you

24   were at.  Did you take any further steps in your investigation

25   at that point?

Whitten - Direct (Kleine)                                              125

1    A.    Yes.  I was part of recovering the property or the -- from

2    the vehicle and taking pictures of the suspect vehicle.

3    Q.    Was the vehicle secured also as well at that time?

4    A.    Yes.

5    Q.    Was it secured by law enforcement?

6    A.    After the fact or...

7    Q.    After Mr. Bates left the area?

8    A.    Oh, yes.

9    Q.    Okay.  And can you explain for the jury why it is that law

10   enforcement wants to -- wanted to secure his vehicle at that

11   time?

12   A.    To make sure that all his personal property is -- is safe

13   and not going to be taken by anybody else.

14            MR. KLEINE:  Okay.  Your Honor, may I approach the

15   witness?  I have a number of exhibits I'd like to show him.

16            THE COURT:  You may.

17            MR. KLEINE:  Thank you.

18            THE COURT:  If you would please put on your mask when

19   you come up here.

20            MR. KLEINE:  Oh, absolutely, Your Honor.  I

21   apologize.

22            THE COURT:  I'm looking forward to the day when we

23   don't have to put them on.

24            THE WITNESS:  Would you like me to put mine on too?

25            THE COURT:  You can leave yours off since he has his

1    on.

2    BY MR. KLEINE:

3    Q.   Sergeant Whitten, I've put a number of exhibits before you

4    and the first one I'd like to talk to you about is Government

5    Exhibit No. 7.  Could you take a look at that exhibit and let

6    me know if you recognize what it is.

7    A.   I recognize it.  It's the red Jeep that Mr. Bates was

8    driving.

9    Q.   Is that a photo of that Jeep?

10   A.   Yes, it is.

11   Q.   Is the photo that's identified in Government Exhibit No. 7

12   something that you actually took?

13   A.   Yes.

14   Q.   You indicated earlier in your testimony that one of your

15   responsibilities was to photograph the area; is that correct?

16   A.   Yes.

17   Q.   After you photographed the Jeep you've just described,

18   what did you do with that photograph?

19   A.   Those photographs get downloaded and put into the case

20   file.

21   Q.   And is that a standard procedure that is used when

22   documenting a scene such as the one on April 6th, 2020?

23   A.   Yes.

24   Q.   How did you photograph that vehicle?

25   A.   It was done with a cell phone.

1    Q.   Okay.  Again, standard procedure by the Douglas County

2    Sheriff's Office to use that technique?

3    A.   Yes.

4    Q.   Why do you photograph?

5    A.   It's just to -- a couple of things.  To ensure that the

6    vehicle isn't damaged, to accurately preserve it as we found

7    it.

8    Q.   It's also evidence, correct?

9    A.   Yes.

10   Q.   The photograph of the Jeep that's identified on Government

11   Exhibit No. 7, is that a true and accurate depiction of that

12   vehicle which you described as it existed on April 6th of 2020?

13   A.   Yes, it is.

14        MR. KLEINE:  Your Honor, at this time we'd offer

15   Government Exhibit No. 7.

16        MR. SHAPIRO:  No objection to 7, Your Honor.

17        THE COURT:  Exhibit 7 is admitted.

18        MR. KLEINE:  May we publish, Your Honor?

19        THE COURT:  You may.

20        MR. KLEINE:  Thank you.

21   BY MR. KLEINE:

22   Q.   Again, Sergeant, on the overhead in front of you and in

23   the exhibit itself in front of you should show you Government

24   Exhibit No. 7.  Is that the Jeep that you were referring to?

25   A.   Yes.

1    Q.    And is that the license plate that you also described

2    earlier?

3    A.    Yes.

4    Q.    Now, after you secured the Jeep that you've discussed, was

5    a search conducted of the interior of the Jeep?

6    A.    Yes, it was.

7    Q.    Were photographs also obtained of the interior of that

8    Jeep?

9    A.    Yes, they were.

10   Q.    Similar line of questioning, why is that done?

11   A.    It's done to -- to document evidence that is found and to

12   document other personal property.

13   Q.    And were those photographs that were taken of the inside

14   of the Jeep, were those taken by you?

15   A.    Yes.

16   Q.    Were they taken using that same cell phone that you

17   previously described?

18   A.    Yes, they were.

19   Q.    After those photographs were taken, were they subsequently

20   transferred to a law enforcement computer and stored?

21   A.    Yes.

22   Q.    When the search of the vehicle was performed, were there

23   items of interest that law enforcement identified?

24   A.    Yes.

25   Q.    Can you describe those for the jury?

1   A.   The -- the items that were identified within the vehicle

2   were a cell phone, some Fireball shooters, and some

3   prescription medication.

4   Q.   And photos were taken of each of those items?

5   A.   Yes.

6   Q.   I'd have you take a look at Government Exhibit No. 8 if

7   you could, sir.

8   A.   (Witness complies.)

9   Q.   Are you there?

10  A.   Yes.

11  Q.   Do you recognize what's depicted in Government Exhibit

12  No. 8?

13  A.   Yes.

14  Q.   Can you identify what that is, please?

15  A.   This is the -- from the passenger side of -- of

16  Mr. Bates's vehicle.  It is the -- it is the front seat of the

17  area or the -- of the vehicle.

18  Q.   It's the interior picture?

19  A.   Yes.

20  Q.   Is that a true and accurate depiction of the interior of

21  that Jeep as it existed on April 6th, 2020, when you took that

22  picture?

23  A.   Yes, it is.

24       MR. KLEINE:  At this time, Your Honor, I'd offer

25  Government Exhibit No. 8.

1          MR. SHAPIRO:  No objection to 8, Your Honor.

2          THE COURT:  Exhibit 8 is admitted.

3          MR. KLEINE:  Your Honor, may I publish?

4          THE COURT:  You may.

5          MR. KLEINE:  Thank you.

6     BY MR. KLEINE:

7     Q.   All right, Sergeant.  Let's talk briefly about Government

8     Exhibit No. 8.  I think you testified this was taken from the

9     passenger side of that Jeep; is that correct?

10    A.   That's correct.

11    Q.   And if we expand a bit upon -- let's just start with the

12    passenger seat.  What did you observe when you took this

13    picture?

14    A.   On the passenger seat, there was alcohol, two Fireball

15    shooters.

16    Q.   Did you also observe anything on the console?

17    A.   Yes.  The cell phone.

18    Q.   Okay.  During the course of the search of the Jeep, I

19    think you also identified pill bottles; is that correct?

20    A.   That's correct.

21    Q.   Okay.  Did you photograph those?

22    A.   I did.

23    Q.   And could you look at Government Exhibit No. 9, please.

24    A.   (Witness complies.)

25    Q.   Do you recognize what's depicted in that exhibit?

1    A.    Yes.

2    Q.    Can you identify what it is?

3    A.    These are two prescription medications that were found

4    within the vehicle.

5    Q.    In Mr. Bates's vehicle?

6    A.    That's correct.

7    Q.    Are those -- is that picture a true and accurate depiction

8    of the pill bottles as they existed on April 6th of 2020?

9    A.    Yes.

10            MR. KLEINE:  Your Honor, we'd offer Government

11   Exhibit No. 9.

12            MR. SHAPIRO:  No objection to 9, Your Honor.

13            THE COURT:  Exhibit 9 is admitted.

14            MR. KLEINE:  May I publish, Your Honor?

15            THE COURT:  You may.

16            MR. KLEINE:  Thank you.

17   BY MR. KLEINE:

18   Q.    Sergeant Whitten, we put on the overhead Exhibit No. 9

19   which you described.  Can you again tell the members of the

20   jury what we're looking at here.

21   A.    Those are two prescription pill bottles that were found in

22   Mr. Bates's vehicle.

23   Q.    And approximately -- do you recall where in the vehicle?

24   A.    They were found in the -- in the console of the vehicle.

25   Q.    The Fireball shooters, which we have -- which you

Whitten - Direct (Kleine)                                                     132

1    discussed in Government Exhibit No. 8, and the pill bottles,

2    which were discussed in Government Exhibit No. 9, were both of

3    those obtained and seized by law enforcement?

4    A.    Yes.

5    Q.    And, again, why does law enforcement take things of that

6    nature?

7    A.    For -- for evidentiary purposes.

8    Q.    I'd ask you now to look at Government Exhibit No. 10 which

9    should also be before you.

10   A.    (Witness complied.)

11   Q.    Do you recognize what Government Exhibit No. 10 is?

12   A.    Yes.

13   Q.    Can you explain what it is?

14   A.    These were the -- the two Fireball shooters that were

15   found on the seat in Mr. Bates's vehicle.

16   Q.    Are those two Fireball shooters identified as Government

17   Exhibit No. 10 in the same or substantially the same condition

18   as when they were found in his vehicle on April 6th, 2020?

19   A.    Yes.

20   Q.    And I'm talking about Mr. Bates's vehicle.

21   A.    Yes.

22   Q.    Thank you.

23          MR. KLEINE:  At this time we'd offer Government

24   Exhibit No. 10.

25          MR. SHAPIRO:  No objection to 10, Your Honor.

 1              THE COURT:  Exhibit 10 is admitted.

 2    BY MR. KLEINE:

 3    Q.   And lastly I'd ask that you take a look at Government

 4    Exhibit No. 11 if you could, sir.

 5    A.   (Witness complied.)

 6    Q.   Can you identify what that exhibit is?

 7    A.   Yes.  Those are the two pill bottles that were found in

 8    Mr. Bates's vehicle.

 9    Q.   Are the two pill bottles identified as Government

10    Exhibit 11 in the same condition today or substantially the

11    same condition today as when they were found in the vehicle,

12    Mr. Bates's vehicle on April 6th, 2020?

13    A.   Yes.

14              MR. KLEINE:  At this time we'd offer Government

15    Exhibit No. 11, Your Honor.

16              MR. SHAPIRO:  No objection to 11, Your Honor.

17              THE COURT:  Exhibit 11 is admitted.

18    BY MR. KLEINE:

19    Q.   Sergeant Whitten, after the vehicle was searched and the

20    evidence that we've discussed was removed, what was done with

21    that property?

22    A.   The property is then taken to the Douglas County Sheriff's

23    Office and booked into our property and evidence room.

24    Q.   And is that to ensure a -- that the evidence is stored

25    properly?

1    A.    Yes.

2    Q.    And that it's in a secured environment?

3    A.    Yes.

4    Q.    Was that done in this case?

5    A.    It was.

6    Q.    After you performed that work which you've already

7    discussed on April 6th, 2020, were you involved in any other

8    aspect of this investigation?

9    A.    No.

10         MR. KLEINE:  Your Honor, I don't have any further

11   questions for Sergeant Whitten at this time.

12         Thank you.

13         THE COURT:  Okay.  I'll now ask if there's any

14   cross-examination.

15         MR. SHAPIRO:  Your Honor, I have no cross-examination

16   of Sergeant Whitten.

17         THE COURT:  Okay.  I'll ask the prosecution,

18   Mr. Kleine, may this witness be excused?

19         MR. KLEINE:  Yes, please, Your Honor.

20         THE COURT:  Any objection to being completely excused

21   from the defense?

22         MR. SHAPIRO:  No objection to that, Your Honor.

23         THE COURT:  Okay.  Officer, you are -- your -- your

24   testimony is completed.  You're no longer needed at this trial.

25   At this point in time, you may put your mask on and leave.

 1    I'll just remind you not to discuss your testimony with any

 2    other witness.

 3              THE WITNESS:  All right.  Thank you.

 4              THE COURT:  You may leave.

 5         I'll hear from the government, your next witness.

 6              MR. KLEINE:  Thank you, Your Honor.  At this time the

 7    government calls Lieutenant Nathan Kovarik with the Douglas

 8    County Sheriff's Office.

 9              THE COURT:  Okay.

10              MR. KLEINE:  Your Honor, may I approach the witness

11    stand and retrieve those exhibits?

12              THE COURT:  You may.

13              MR. KLEINE:  I'm also going to bring up additional

14    exhibits just to avoid having --

15              THE COURT:  That sounds great.

16              MR. KLEINE:  All right.

17              THE COURT:  Officer, you may come up here to the

18    witness stand and stand next to the witness chair, and at that

19    point in time, our courtroom deputy will swear you.

20              COURTROOM DEPUTY:  Please state your full name for

21    the record and spell your first and last name.

22              THE WITNESS:  Nathan Kovarik.  N-a-t-h-a-n

23    K-o-v-a-r-i-k.

24               NATHAN KOVARIK, PLAINTIFF'S WITNESS, SWORN

25              THE COURT:  You may be seated.

1    MR. KLEINE:  Your Honor, I was a little slow on my

2    game.  I -- I think we have the exhibit up here that I was

3    looking for.  May I approach?

4    THE COURT:  Okay.  You may.

5    MR. KLEINE:  Okay.  Thank you.

6    May I proceed?

7    THE COURT:  You may.

8    MR. KLEINE:  Thank you, Your Honor.

9                    DIRECT EXAMINATION

10   BY MR. KLEINE:

11   Q.    Lieutenant, would you please introduce yourself to the

12   members of the jury.

13   A.    I'm Lieutenant Nathan Kovarik with the Douglas County

14   Sheriff's Office.

15   Q.    Lieutenant, how long have you been a member of that police

16   force?

17   A.    Eighteen years.

18   Q.    What is your current position?

19   A.    I'm currently the lieutenant in charge of the court

20   services bureau.

21   Q.    What does that involve?

22   A.    I oversee court security operations for our district court

23   division, county court divisions, building security division,

24   and entrance security division.

25   Q.    Is that on the state court level or the federal level?

Kovarik - Direct (Kleine)                                           137

1    A.    The state level.

2    Q.    So you would be working right up the street here at

3    Douglas County District Court?

4    A.    Yes.

5    Q.    Prior to your position up the street in Douglas County,

6    were you working in another capacity?

7    A.    Yes.  I was promoted in January.  Before that I was

8    working as the sergeant for our criminal investigations

9    division.

10   Q.    So that would have taken us back to at least April of

11   2020; is that fair?

12   A.    Yes.

13   Q.    Can you tell the members of the jury some of the duties

14   and responsibilities that you had in that position.

15   A.    I oversaw our afternoon investigators, there was about

16   four investigators that I supervised, and I would also assist

17   on investigations.  I also would help with phone extractions as

18   part of my duties.

19   Q.    The investigators that you supervised back in April of

20   2020, did that include individuals who were investigating human

21   trafficking related crimes --

22   A.    Yes.

23   Q.    -- including child exploitation?

24   A.    Yes.

25   Q.    You also mentioned, Lieutenant, that at the time you were

Kovarik - Direct (Kleine)                                      138

1   assisting with the processing and handling of digital evidence?

2   A.   Yes.

3   Q.   And I think you referenced cell phones; is that correct?

4   A.   Yes.

5   Q.   Over the course of your career, have you received specific

6   training as it relates to processing and handling of digital

7   evidence such as cell phones?

8   A.   Yes.

9   Q.   Can you explain for the jury what that training has been.

10  A.   I received my basic training at the Nebraska Law

11  Enforcement Training Center in 2003.  Over the course of my

12  career, I've taken about 112 hours of computer forensic

13  training through the National White Collar Crime Center; I've

14  also taken 40 hours of Cellebrite training through -- that was

15  a -- through Cellebrite; and I've had five hours of

16  recertification training in Cellebrite; and I also completed my

17  master's degree in cybersecurity from Bellevue University.

18  Q.   Lieutenant, I want to turn your attention now specifically

19  to the April 6th time period of 2020.  Around that time period

20  were you asked to assist with an investigation involving the

21  defendant, Jason Bates?

22  A.   Yes.

23  Q.   What was your role in that investigation?

24  A.   I conducted the forensic extraction of his -- of his cell

25  phone.

Kovarik - Direct (Kleine)                                          139

1    Q.   Do you recall the type of cell phone that that was?

2    A.   It was an Apple iPhone.

3    Q.   What was the purpose of the work that you were doing on

4    that cell phone?

5    A.   To extract evidence of the investigation that they were

6    working on.

7    Q.   Were you asked to make a forensic copy of whatever was on

8    that cell phone so that law enforcement could then review and

9    inspect what was on that phone?

10   A.   Yes.

11   Q.   Now, were you present at the time of Mr. Bates's encounter

12   with law enforcement on April 6th, 2020?

13   A.   No.

14   Q.   Do you recall when it was that you were first asked to

15   work on this case?

16   A.   April 9th.

17   Q.   Okay.  Lieutenant, before you we have identified what's

18   been previously received into evidence as Government Exhibit

19   No. 14.  Could you take a look at that.

20   A.   (Witness complied.)  It's the Apple iPhone.

21   Q.   Okay.  Was that the Apple iPhone that you were asked to

22   take a look at on behalf of the Douglas County Sheriff's

23   Office?

24   A.   Yes.

25   Q.   Do you recall how you had received that iPhone?

Kovarik - Direct (Kleine)                                              140

1    A.    I received it from Deputy Chad Miller.

2    Q.    And when you received it from Deputy Miller, was there

3    something that he asked you specifically to do with that phone?

4    A.    Yes.  To conduct a forensic extraction of the phone.

5    Q.    Generally speaking, after you receive a phone such as

6    Government Exhibit 14, what is the process that is used to

7    forensically copy it?

8    A.    The first step would be to ensure the phone is in airplane

9    mode.  If it's not in airplane mode, you would put it in

10   airplane mode.  And then from that point, you would attach it

11   to the Cellebrite software and go through the -- the process of

12   extracting it through Cellebrite.

13   Q.    All right.  Let's start with step one, the airplane mode.

14   Why is that done?

15   A.    To ensure that data is not changed or added to the phone.

16   Q.    Okay.  So it's to preserve the evidence?

17   A.    Yes.

18   Q.    Oh, excuse me, I apologize.  To preserve the -- the

19   digital evidence on the phone?

20   A.    Yes.

21   Q.    Okay.  And in this case when you received Government

22   Exhibit No. 14 from Deputy Miller, was it already in airplane

23   mode?

24   A.    Yes.

25   Q.    And, again, that was so that the evidence was properly

1    preserved?

2    A.    Yes.

3    Q.    After you received Government Exhibit No. 14, did you then

4    utilize -- I think you referenced something called Cellebrite?

5    A.    Yes.

6    Q.    And is that a law enforcement tool?

7    A.    Yes, it is.

8    Q.    What is that tool specifically designed to do?

9    A.    To forensically extract data off of cell phones and

10   tablets.

11   Q.    Is that a tool that is a standard tool that is used by law

12   enforcement to extract information from cell phones?

13   A.    Yes.

14   Q.    Is that something that has been used by Douglas County

15   Sheriff's Office in the past?

16   A.    Yes.

17   Q.    And is it still something that is being used today?

18   A.    Yes.

19   Q.    Now, I think you mentioned that you had received specific

20   training in Cellebrite; is that correct?

21   A.    Yes.

22   Q.    And you referenced how many hours?

23   A.    Forty hours of initial certification and then there was

24   five hours of recertification in 2019.

25   Q.    In April of 2020, was your certification in Cellebrite up

1    to date?

2    A.   Yes.

3    Q.   Can you explain for the members of the jury what the

4    Cellebrite tool does when it's forensically imaging a cell

5    phone.

6    A.   Sure.  So what it does is you -- you attach the phone to

7    a -- one of our laptops that has the Cellebrite software loaded

8    on it, and then there's a -- just a series of directions.  You

9    tell Cellebrite what phone it is, and then it goes through an

10   automated process of extracting the information off of the

11   phone.

12   Q.   In a secure fashion?

13   A.   Yes.

14   Q.   And does that program work to avoid a situation where the

15   phone is plugged into a computer and data on the phone is

16   changed or manipulated?

17   A.   Yes.

18   Q.   And that's what it's designed for, correct?

19   A.   Correct.

20   Q.   Now, when it does this forensic imaging of a cell phone,

21   does the Cellebrite tool only capture data that's on the phone?

22   A.   Yes.

23   Q.   It doesn't reach up to the cloud or other digital devices

24   to obtain information, does it?

25   A.   No.

1  Q.    Okay.  So if somebody on their cell phone has data that is

2  deleted or they clear their web browsing history and then that

3  memory is subsequently overwritten by other data, it's never

4  going to be recovered, is it?

5  A.    Correct.

6  Q.    You can only -- or excuse me.  The Cellebrite only

7  recovers what's actually on the phone.

8  A.    That's correct.

9  Q.    Over the course of your career, how many cell phones have

10  you forensically imaged using Cellebrite?

11  A.    About 50.

12  Q.    And when a phone is imaged using that tool, if there is an

13  error or it's not done correctly, are you made aware of that as

14  the tech who's performing that function?

15  A.    Yes.  The Cellebrite program puts an error message on the

16  screen notifying you that there's been a problem.

17  Q.    So that in the event there's a problem, you can try and

18  figure out what it is because you're trying to ensure that the

19  data being extracted matches what's on the phone, correct?

20  A.    True, yes.

21  Q.    How long do those extractions typically take?

22  A.    About an hour.

23  Q.    Can they take longer?

24  A.    Yes.

25  Q.    Take shorter?

Kovarik - Direct (Kleine)                                          144

1   A.    Yes.

2   Q.    Does it just depend on how much data's actually on the

3   phone?

4   A.    Yes.

5   Q.    After an extraction is completed using that tool, what is

6   then done with the phone?

7   A.    The phone's returned to property and evidence.

8   Q.    Okay.  In a secure fashion?

9   A.    Yes.

10  Q.    To ensure that it's -- the data's saved and not

11  compromised?

12  A.    Correct.

13  Q.    What is done with the extraction itself?

14  A.    It's loaded onto a thumb drive and then provided to the

15  investigator.

16  Q.    Specifically with regard to Government Exhibit No. 14, did

17  you follow the process which you just described when you

18  forensically copied that phone?

19  A.    Yes.

20  Q.    Again, if you could explain for the jury the steps that

21  you took to ensure that Government Exhibit No. 14 was

22  forensically analyzed in a correct and proper manner.

23  A.    Sure.  So I took this phone, I used our -- our Cellebrite

24  laptop that we have and went through the automated process of

25  the phone.  I ensured that it was in airplane mode, and after

Kovarik - Direct (Kleine)                                      145

1    the -- the software had completed the extraction, I took the

2    report, it's -- it's in a digital form, and I put that on a

3    thumb drive, I provided that to Deputy Miller.

4    Q.   Okay.  Any error messages indicating that the data from

5    Exhibit No. 14 was not properly imaged?

6    A.   No.

7    Q.   Okay.  Now, you've -- have you had a chance to review the

8    Cellebrite information that was withdrawn or imaged from that

9    cell phone?

10   A.   Yes.

11   Q.   And before you is Government Exhibit No. 18.  Can you take

12   a look at that exhibit.

13   A.   (Witness complied.)

14   Q.   Now, you're looking at a -- a thumb drive, but can you

15   tell what that -- Government Exhibit No. 18 is?

16   A.   It's the forensic extraction from Jason Bates' phone.

17   Q.   How do you know that?

18   A.   Because I reviewed it the other day in your office.

19   Q.   Okay.  And did you note your initials and a date on this?

20   A.   Yes, put my initials and the date.

21   Q.   After you had a chance to review that extraction, were you

22   able to confirm in fact the data on Government Exhibit No. 18

23   was taken from Government Exhibit No. 14, which is Mr. Bates's

24   phone?

25   A.   Yes.

Kovarik - Direct (Kleine)                                146

1    Q.   Is what is contained on Government Exhibit No. 18 a true

2    and accurate copy of Mr. Bates's phone identified as Government

3    Exhibit 14?

4    A.   Yes.

5    Q.   And that's a true and accurate copy as of the date that it

6    was provided to you; is that fair?

7    A.   Yes.

8         MR. KLEINE:  At this time, Your Honor, we'd offer

9    Government Exhibit No. 18.

10        MR. SHAPIRO:  There's no objection to 18, Your Honor.

11        THE COURT:  Exhibit 18 is received.

12        MR. KLEINE:  Thank you, Your Honor.

13   BY MR. KLEINE:

14   Q.   Lieutenant, after you obtained the information from

15   Mr. Bates's phone and created this extraction, what did you do

16   with his phone specifically?

17   A.   It was placed back in property and evidence.

18   Q.   Okay.  Since that time have you accessed his phone for any

19   other reason?

20   A.   No.

21   Q.   With regard to Government Exhibit No. 18, the forensic

22   copy of that phone, what did you do with that information?

23   A.   I gave it to Deputy Miller.

24   Q.   Did you look through that information?

25   A.   No.

1    Q.   Did --  Other than confirming that it matched?

2    A.   True.  Yes.  I didn't -- I didn't look through the files

3    particularly.  I just saw that the extraction was complete.

4    Q.   Were you asked to perform any analysis on what was

5    contained on Mr. Bates's phone as it relates to looking through

6    that extraction?

7    A.   No.

8    Q.   Didn't search his texts or his web history or anything of

9    that nature?

10   A.   No.

11   Q.   That wasn't your responsibility?

12   A.   Correct.

13   Q.   After you completed that work, you then I think you

14   testified provided the extraction to Deputy Miller for him to

15   do what he wanted to do with it?

16   A.   Correct.

17   Q.   Okay.  Did you do any further work as it relates to this

18   investigation after you completed the forensic extraction of

19   Mr. Bates's phone?

20   A.   No, I didn't.

21          MR. KLEINE:  I don't have any further questions for

22   this witness at this time, Your Honor.  Thank you.

23          THE COURT:  Will there be any cross-examination of

24   this witness?

25          MR. SHAPIRO:  Judge, I have no cross-examination of

1    Lieutenant Kovarik.

2              THE COURT:  Okay.  Do you think it might be a few

3    minutes to take --

4              MR. SHAPIRO:  No, I don't have any questions.

5              THE COURT:  Oh, you don't have any.

6              MR. SHAPIRO:  Yes, sir.

7              THE COURT:  I'm sorry.

8              MR. SHAPIRO:  No, sir.  My apologies.  No

9    cross-examination.

10             THE COURT:  No cross-examination.  Okay.

11        Officer --  Well, let me ask the prosecution.  May this

12   witness be released?

13             MR. KLEINE:  Yes, Your Honor.

14             THE COURT:  Okay.  Same from the defense?

15             MR. SHAPIRO:  Yes, Your Honor.

16             THE COURT:  Okay.  Officer, your testimony is

17   concluded.  I just remind you not to discuss your testimony

18   with any other witness in this case.  You may leave.  And I

19   don't remember if you had a mask on when you came in.  You're

20   required to have a mask out in the atrium, so if you need one,

21   just grab one in that pile right there.

22             THE WITNESS:  All right.  Thank you.

23             THE COURT:  You bet.  Thank you.

24        At this point in time, will there be any additional

25   witnesses from the prosecution?

 1           MS. SMITH:  Yes, Your Honor.  We intend to call --

 2     recall Deputy Miller to the stand.

 3           THE COURT:  Okay.  Well, at this point in time, given

 4     we're at 4:30 p.m., what I'm going to do is we're going to

 5     break for the day.

 6       So at this point in time, I would just remind the jury of

 7     my prior admonition that you're not to talk to anyone about

 8     this case, including each other.  You're not to text about it,

 9     you're not to get on the Internet and search about this case,

10     stay away from the press.  I don't know if this case will be

11     reported in the press but it might be.

12       So I remind you to do that.  I just want to remind you of

13     all that.  So at this point in time --  I do want you back here

14     about five minutes till nine in the morning tomorrow to

15     continue this trial.  So I thank you for your attention today.

16       At this point in time, I would invite everyone to please

17     rise as the jury is released.

18           (Jury out at 4:33 p.m.)

19           THE COURT:  You all may be seated.

20       At this point in time, if the prosecution is willing, I

21     understand you're going to recall Deputy Miller.  What -- what

22     other sort of timing and planning purposes -- is there anything

23     else you intend to do, or if you don't wish to say so, you can

24     say that too.

25           MS. SMITH:  There's potentially one additional

1    witness, Your Honor, but she would be a short witness.

2            THE COURT:  Okay.  At this point in time.  And if

3    you're willing to say from the defense, is there any change in

4    your plans not to call any witnesses?

5            MR. SHAPIRO:  No change at this time and I don't

6    expect there would be, Your Honor.

7            THE COURT:  Okay.  At this point in time, what I want

8    to say is I do think we should have a hearing at 8:30 in the

9    morning to discuss our -- our jury instructions so please be

10   prepared.  I sent off the jury instructions I think last week

11   so just be prepared to state if you have any objections to the

12   ones that I prepared or any corrections.  If I have any typos,

13   I entertain hearing about those too to get them corrected.  And

14   also if there's any instruction I did not include into the

15   instructions that you wish to make a record on and try to

16   convince me to include it, you may do that as well.

17        So aside from that item of business -- and we'll handle

18   that tomorrow morning before our proceedings start -- is there

19   anything else we should discuss at this point in time?  We'll

20   start with the prosecution.

21           MS. SMITH:  Just one thing, Your Honor.  In preparing

22   for closing, Mr. Kleine and I were wondering if the Court would

23   allow a split between counsel in rebuttal closing and closing.

24   So I would do closing, Mr. Kleine would do rebuttal closing.

25           THE COURT:  All right.  Would there be any objection

1    from the defense as to that arrangement?

2            MR. SHAPIRO:  I have no problem or objection to that,

3    Your Honor.

4            THE COURT:  Okay.  I will allow that so --

5            MS. SMITH:  Thank you.

6            THE COURT:  -- that will be allowed.

7        So is there anything else that we need to hear?

8            MS. SMITH:  No thank you.

9            THE COURT:  Okay.  From the -- from the defense is

10   there anything else that you wish to bring up?

11           MR. SHAPIRO:  Not today, Your Honor.  Thank you.

12           THE COURT:  Okay.  We'll see you tomorrow morning to

13   address the jury instructions.  At this point in time, we are

14   in recess.

15       Thank you very much.

16       (Recess taken at 4:35 p.m.)

17

18                        *  *  *  *  *  *  *

19

20

21       I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

22

23           */s/Rogene S. Schroder*                 August 26, 2022
             Rogene S. Schroder, RDR, CRR                Date

24

25

```
 1                            I-N-D-E-X

 2                               Direct    Cross    Redirect

 3   WITNESSES:
     FOR THE PLAINTIFF:
 4
     Chad Miller                   27        82       102
 5
     Joshua Echtinaw              109
 6
     William Niemack              114
 7
     Travis L. Whitten            119
 8
     Nathan Kovarik               136
 9

10   MOTIONS                                  Made      Ruling

11   Plaintiff's motion in limine re: entrapment,
     Filing 46                                            6
12

13   EXHIBITS:                             Offered     Ruling

14    1.  Skip the Games home page           32         32

15    2.  Skip the Games advertisement       34         34

16    3.  Text message conversation between
          Bates and Undercover Officer       42         42
17
      4.  Advice of Rights Form              68         68
18
      5.  CD containing video of interview of
19        Bates                              69         69

20    6.  CD containing DCSO surveillance video
          of 154th and Pacific Kum & Go     112        112
21
      7.  Photograph of vehicle            127        127
22
      8.  Photograph of passenger seat     129        130
23
      9.  Photograph of pills              131        131
24
     10.  Two Fireball Cinnamon Whisky shooters  132   133
25
```

| 11. | Sildenafil pills | 133 | 133 |
| 12. | $200 Currency | 79 | 79 |
| 13. | CD containing surveillance video of 189th and Pacific Kum & Go | 78 | 78 |
| 14. | Black iPhone | 71 | 71 |
| 18. | Thumb drive - extractions from iPhone | 146 | 146 |
| 19. | Portions of Exhibit 5 - Bates interview | 69 | 69 |